**[Cite as *In re Jaz. M.*, 2024-Ohio-5413.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re Jaz. M., Jay. M.

Court of Appeals No.  L-24-1134
                      L-24-1135

Trial Court No.  JC21287050
                 JC22292032

## DECISION AND JUDGMENT

Decided:  November 6, 2024

* * * * *

Emily W. McGill, for appellee.

Autumn D. Adams, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} In these consolidated appeals, the appellant, T.M. ("mother") appeals the May 1, 2024 judgments of the Lucas County Court of Common Pleas, Juvenile Division terminating her parental rights and granting permanent custody of two of her children to Lucas County Children Services ("LCCS"), the appellee herein.  We affirm.

## I. Background

{¶ 2} Mother is parent to four children: Jai.K (Child 1), Jaz.M. (Child 2), Jay.M. (Child 3), and Jo.M (Child 4). This case pertains to Child 2 and Child 3 only (referred to collectively as "the children").

{¶ 3} S.M. is Child 2's father and A.T. III is Child 3's father. Both fathers were properly served and summoned in this case, but did not participate in the trial court proceedings or appeal the judgment terminating parental rights. Accordingly, we limit our discussion to mother's parental rights.

### A. The family's involvement with LCCS

{¶ 4} LCCS became involved with this family in 2017, in a case involving Child 1 (d.o.b. 3/10/2017). Mother became pregnant with Child 1 while still a minor and while living with her foster-mother, K.G. Mother's parental rights as to Child 1 were involuntarily terminated on June 12, 2019, due to mother's failure to complete case planning services for mental health and parenting. (Case No. JC17261412). Records from that case were admitted herein. Following those proceedings, K.G. adopted Child 1. Thus, K.G. (hereinafter referred to as "foster-mother") was the foster-mother to mother, when she was a minor, and later to Child 1. When mother became an adult, she moved out of foster-mother's home.

{¶ 5} On November 22, 2021, LCCS received a referral that mother had delivered a baby girl (Child 2) at St. Vincent Hospital in Toledo and that mother previously had her parental rights terminated (Child 1). Two days later, it filed a complaint in dependency

2.

and neglect, alleging that a caseworker met with mother in the hospital and that mother admitted that she is not currently receiving any mental health services and did not believe that any were needed. (LCCS case No. JC21287050). LCCS also alleged that "[t]here were several calls for domestic violence involving mother" that were made from mother's address. LCCS was awarded interim temporary custody at an emergency shelter care hearing that same day, November 24, 2021. Later, Child 2 was adjudicated to be dependent and neglected, and LCCS was awarded temporary custody, following a hearing on January 12, 2022.

{¶ 6} Child 3, a boy, was born one year later, on December 11, 2022. LCCS filed a complaint in dependency at that time (LCCS case No. JC22292032), citing mother's failure to complete her case plan services in the case involving Child 2 and the previous termination case. At an adjudication hearing on February 2, 2023, Child 3 was found to be a dependent child, and LCCS was granted temporary custody.

{¶ 7} Mother's case planning services as to Child 2—and continuing after Child 3 was born—included services for "domestic violence survivors," mental health, and parenting. The trial court adopted these plans as orders of the court. Mother completed her domestic violence services and engaged in mental health services, first at Ohio Guidestone and later at the Family and Child Abuse Prevention Center. Mother received training in parenting skills through "one-on-one" sessions with an LCCS "permanency support worker."

3.

{¶ 8} Based upon mother's progress in her case planning services, the trial court granted legal custody of Child 2 and Child 3 to mother, with protective supervision by LCCS, on April 24, 2023.

{¶ 9} The children's reunification with mother was short-lived. Following an emergency hearing on August 1, 2023, the trial court granted LCCS interim temporary custody. It awarded temporary custody to the agency on November 2, 2023.

**B. The placement of Child 2 and Child 3.**

{¶ 10} Following their respective births, the children were each placed with the same foster-mother who cared for mother, when she was a minor and who adopted Child 1 after mother's parental rights were terminated. Foster-mother remained their caregiver until they were reunified with mother in April of 2023. However, when the children were removed from mother in August, foster-mother indicated that she could not care for the children at that time, and the children were placed with a new foster family.

{¶ 11} In October of 2023, LCCS investigated a complaint that Child 2 had a bruise near her bottom, and the children were removed from the new foster family and placed with foster-mother "for respite." Although the referral was unsubstantiated, the children remained with foster-mother, who has since expressed her desire to keep both children and her willingness to adopt them.

**C. The trial proceedings.**

{¶ 12} On November 16, 2023, LCCS filed for permanent custody of Child 2 and Child 3, and a trial was held on March 28, 2024. A number of witnesses testified at trial,

4.

including an LCCS assessment caseworker (Carmen Kantner); a hospital social worker (Melissa Keller); the owner of the children's former daycare (Cheryl Wilson); an LCCS permanency support worker (Megan Hennessey); the ongoing caseworker (Selena Evans); and the court appointed special advocate (Terri Town). Mother appeared at the hearing but did not testify or call any witnesses. The following is a summary of the relevant testimony and evidence presented at trial.

**The birth of Child 4**

{¶ 13} Two witnesses testified about the birth of Child 4, who was born in January of 2024 and who is *not* the subject of this consolidated case. Over the objection of mother's counsel, the LCCS assessment worker, Carmen Kantner, testified that when Child 4 was born at St. Vincent Hospital, she had a "brief conversation" with mother. Kantner's purpose was to notify mother that a "placement custody staffing meeting" would be held to "discuss" Child 4. Mother was "upset" by the news and responded that "she wanted [Kantner] to get out of her room." Afterward, mother "attempted to leave the hospital with the baby." As a result, LCCS requested an "ex parte order for custody" over the weekend.

{¶ 14} When mother was being discharged, the hospital social worker, Melissa Keller, was "called to the floor" because mother was "being very loud" and the nursing staff was "unable to de-escalate." Mother insisted that she would not "leave without her child" and that LCCS had "no right" to take her child away. Keller confirmed that mother likely did not know about the ex parte order. Keller contacted LCCS so that

5.

someone from the agency could explain the plan with regard with Child 4. Mother was "not receptive to the process" and threatened "to sue." Ultimately, Keller had to call hospital security to assist with mother's discharge.

### The children's daycare provider

{¶ 15} Cheryl Wilson is the owner of Family Affair Childcare, where the children received care "since birth" while in foster-mother's custody.

{¶ 16} According to Wilson, the children and foster-mother "enjoyed" being together, and when foster-mother arrived for pick-up, the children were "very excited."

{¶ 17} Wilson continued to provide care for the children after they were reunified with mother for about a "month or two," but then mother "pulled them." During that time, the children "were just not the same," according to Wilson. She testified that the children would arrive "whining, crying [and] hungry," and at the end of the day, they "[d]idn't want to leave." Wilson described mother as "unpredictable" and "anxious" and instructed her staff to "limit the conversation" with her. Mother complained about "problems with her car," with "having a job," the babies "crying all the time," and that Child 2 "wouldn't sleep" and then "couldn't wake up." At first, Wilson thought that mother was just "getting used" to full-time parenting but "as time went on," Wilson wondered if "something [was] just not right."

{¶ 18} When asked if she had observed mother "angry," Wilson responded "oh yeah." She recalled a "fight" over mother's failure to provide vaccination records. Another time, mother accused Wilson of "trying to discriminate" by not allowing the

6.

children to attend, when in reality, it was a holiday, and the daycare was closed. On one occasion, Wilson told mother that she could not take her son, still an infant, because she was not staffed appropriately for a child so young and taking him would put them "out of ratio" and subject Wilson to legal trouble. Mother took the conversation "in another way" and accused Wilson's staff of "yelling" at her daughter on a previous occasion. Mother said "nobody yells at my kids" and "I don't want to be here anyway." Mother then un-enrolled the children from the daycare. According to the record, mother's decision to withdraw the children from Wilson's daycare would have many negative consequences.

{¶ 19} On cross-examination, Wilson testified that she is foster-mother's great-aunt and that she has "taken care of all of her kids."

### The permanency support caseworker

{¶ 20} In advance of the children's reunification with mother, Megan Hennessey, a "permanency support caseworker," was assigned to this case. Hennessey regularly met with mother, beginning on March 27, 2023.

{¶ 21} Hennessey testified that she (1) helped mother apply for food stamps and medical care from the Ohio Department of Job and Family Services ("ODJFS"); (2) located and then enrolled the children in suitable day care after mother "pulled" them from their previous provider; (3) secured a three-day emergency bus pass when mother's car burned; (4) helped "to get some . . . funding" in the amount of $1500 for mother, toward the purchase of a new car; (5) communicated with the children's medical provider

7.

to obtain records so that the children could enroll in daycare; (6) took mother grocery shopping after she obtained food vouchers; (7) located someone to take mother to a job fair; (8) provided a "good" reference for mother to work at TJ Maxx; and (9) took mother to consult with The Fair Housing Center in Toledo regarding a "legal issue" with her low-income housing.

{¶ 22} Hennessey described her "unique" role as encouraging mother to stay "calm and assertive and [to] advocate for [her]self," and she talked to mother "extensively" about the need to "problem solve," especially once the children were returned to her care. But, according to Hennessey, mother often "[came] up with one reason after another . . . as to why" Hennessey's proposed solutions "wouldn't work." Mother also frequently directed her frustrations at Hennessey.

{¶ 23} For example, when mother's emergency bus pass did not work, mother contacted Hennessey "upset" and claimed that she "almost got arrested" and later "yelled" at Hennessey because she (i.e. mother) "didn't know how to use the bus." During a tour of a potential apartment, when mother and Hennessey learned that she would not qualify, mother became "upset" and began "spouting off." Hennessey counseled mother to "keep it together" because "they're watching you and how you're acting" and also because "[i]t's not her fault that they don't have low-income housing."

{¶ 24} After mother "pulled" the kids from Wilson's daycare center, mother had "all these troubles" finding suitable care. Hennessey "worked for about three days" and was successful at finding a provider that could accommodate mother's irregular hours.

8.

At Hennessey's instruction, mother took medical forms to the pediatrician's office but soon called Hennessey, who could hear the staff "threaten[] to call the police on [mother]," based on how "upset" mother was "at them." Later, mother said that she "didn't have enough gas to take" the enrollment paperwork to the new provider, so Hennessey took it herself and "turned everything in." With enrollment complete, Hennessey told mother to "reach out" to the daycare to coordinate the children's first day. Instead, mother called Hennessey to ask "[w]hat's the plan," when the children should have been in school. After the children began attending the day care, mother complained to Hennessey that the staff were "retards" and that she could not leave the kids there because she did not have any "unopened packages of diapers." Hennessey encouraged mother to "figure these things out" because "[t]his is what being a mom includes." Hennessey terminated the call "because [mother] was yelling and screaming at me and it wasn't productive."

{¶ 25} The last day the two worked together was June 14, 2023, when Hennessey, Caseworker Evans, a trainee, and the CASA went to mother's home for a home visit. Mother appeared "extremely overwhelmed, . . . really upset and crying." Mother was upset because the new daycare was closed due to a virus there, and she was certain to lose her job. During the meeting, mother told Hennessey that she did not want to work with her anymore, and Hennessey left at mother's request.

{¶ 26} Hennessey testified that, "[a]t the end, it was really hard" working with mother because "she was upset about stuff left and right." Hennessey testified that she

9.

felt "concerned about how things would go for [mother] without somebody to help her every step of the way."

**The caseworker**

{¶ 27} Selena Evans worked as mother's caseworker for about 15 months, beginning in December 2022 and continuing through the March 2024 trial.

{¶ 28} Regarding case planning, mother's initial case plan called for her to complete a dual diagnostic assessment, to attend a domestic violence survivor's program and to receive mental health services. According to Evans, mother completed the dual diagnostic assessment and the domestic violence class and completed "some" mental health services.

{¶ 29} With regard to mother's mental health, specifically, Evans explained that mother was not receiving any care when Child 2 was born, even though she had lost custody of Child 1 in 2019 for that same reason. When this case was opened, mother began receiving treatment at Ohio Guidestone, where she was diagnosed with oppositional defiant disorder and major depressive disorder. Mother's treatment goals were to "increase self-sufficiency in order to regain daily living skills" and to "learn to adjust to life stressors." In February of 2023, mother switched providers, on her own accord, and began treating at Family and Child Abuse Prevention Center. Mother was discharged from that provider in June of 2023 due to "verbal aggression, dissatisfaction of services and the counselor not feeling safe around [mother] anymore." After that, mother and Evans agreed to transfer mother's care to Unison, but she was a "no-show"

10.

for her rescheduled appointment on July 27, 2023 and never completed the initial assessment or received any treatment there. On August 1, 2023, mother returned to Ohio Guidestone but without a referral from LCCS. And, according to Evans, mother reported to them that "everything was going well." She also failed to explain the circumstances of the children's recent removal. Based upon her self-report, the provider made "no recommendation" for ongoing care. Evans testified that mother has since refused to complete a new assessment or to "reengage in mental health services," and as of the March 28, 2024 trial, mother was receiving "no care." For these reasons, mother "did not successfully complete treatment" with regard to the mental health aspect of her case plan.

{¶ 30} Evans also explained the events that led to the children being removed from mother's care in late summer of 2023 and the agency's subsequent decision to seek permanent custody.

{¶ 31} On July 18, 2022, LCCS received a referral that "the children could be heard getting hit" and that "there were marks on their arms." An LCCS investigator visited mother's home that day, and according to Evans, the children "appeared to be fine with no marks or bruises." On July 24, 2023, the agency received a referral that mother "was heard yelling at the children." Evans met with mother the next day, and mother told her that the police had been called out, but that there "there were no issues." Mother claimed that the "neighbor was calling in [these] allegations." At that time, Evans suggested that it would be a "good idea" for mother to participate in Parenting Empowerment, a parenting class offered through LCCS. Mother signed releases for the

11.

program, but a "few hours later," mother called the program's director, claiming that she "did not agree to that programming and that [Evans] forged her signature." Mother did not appear for the appointment and did not engage in parenting services.

{¶ 32} Subsequently, mother called LCCS "after hours," asking to speak to the director of the agency to complain that some of her children's toys were still at foster-mother's house. Evans testified that this non-emergent, after-hours phone call to the *director* of the agency was a cause of concern, especially because mother is on good terms with foster-mother and could have called her directly. Mother's phone call followed other disturbing behavior, including her false complaint that Evans had forged her signature, her "firing" of the permanency support worker, and her refusal to participate in parenting classes.

{¶ 33} Due to concerns for mother's "untreated" mental health, a meeting was scheduled for July 28, 2023, which mother was asked to attend. When she did not appear, Evans went to her home and attempted to contact her by email and by phone. When mother could not be located, LCCS immediately requested a custody order. Following an emergency shelter care hearing, LCCS was granted interim temporary custody of the children.

{¶ 34} Evans's last interaction with mother occurred on August 18, 2023, when mother called the agency, falsely claiming that Evans had "illegally entered her home."

12.

**The CASA**

{¶ 35} Terri Town served as the children's court appointed special advocate ("CASA"). Town also served as the CASA with regard to Child 1.

{¶ 36} Because of her history with this family, Town was asked if she had observed any changes in mother's mental health over the years. In Town's opinion, mother improved, to the point that Town supported the children's reunification with her in April of 2023. However, about "two to three weeks" after the children were in mother's care, Town received "multiple calls and text messages" from foster-mother who said that "mother [kept] calling." Foster-mother reported that she had "to go get the children multiple times because mom was stressed out."

{¶ 37} Town witnessed mother's stress, first-hand, when she attended the home visit with the caseworkers in June of 2023. Although the children were "cared for," she observed that mother's "mental health . . . escalates very quickly." Town supported the children's removal from mother because although mother "does very well if someone is there constantly helping her. . . she struggles [on her own]."

**D. The trial court grants LCCS's motions**.

{¶ 38} On May 1, 2024, the juvenile court issued a decision and judgment entry, in each case, granting LCCS's motion for permanent custody. As to mother, the court found, pursuant to R.C. 2151.414(B)(1)(a), that the children could not be placed with her within a reasonable time and should not be placed with her, based on its findings under R.C. 2151.414(E)(1), (2) and (11). Separately, the court also found, pursuant to R.C.

13.

2151.414(B)(1)(d), that Child 2 had been in the temporary custody of LCCS for 12 or more months of a consecutive 22-month period, preceding the filing of LCCS's motion for permanent custody on November 16, 2023.

{¶ 39} Next, the juvenile court analyzed the best interest factors set forth in R.C. 2151.414(D)(1).  Based upon its review, it found, by clear and convincing evidence, that a grant of permanent custody to LCCS was in the children's best interest.  Accordingly, the court granted LCCS's motions, terminating mother's parental rights and awarding permanent custody of the children to the agency.

{¶ 40} Through appellate counsel, mother appealed the juvenile court's permanent custody decisions.  She raises a single assignment of error for our review:

> I.  The findings Mother failed to remedy the reasons which caused removal of the children, and thus permanent custody to LCCS was in their best interest, was against the manifest weight of the evidence presented at trial.

## II.  Law and Analysis

{¶ 41} Parents have a fundamental liberty interest in the care, custody, and control of their children.  *In re K.H.*, 2008-Ohio-4825, ¶ 39.  However, the right to parent one's children is not absolute; it does not give a parent a right to abuse or neglect a child.  *Id.* at ¶ 40.  The state has broad authority to intervene to protect children from abuse and neglect.  *In re C.F.*, 2007-Ohio-1104, ¶ 28, citing R.C. 2151.01.  "An award of permanent custody, which terminates parental rights, is a last resort and is only justified when it is

14.

necessary for the welfare of the child." (Citation omitted.) *In re L.R.-L.*, 2023-Ohio-2071, ¶ 24 (10th Dist.). Because granting permanent custody terminates parental rights, "parents 'must be afforded every procedural and substantive protection the law allows.'" *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991).

**{¶ 42}** R.C. 2151.414 sets forth "specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child." *In re T.J.*, 2021-Ohio-4085, ¶ 36 (6th Dist.). As relevant here, the court must find by clear and convincing evidence (1) that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies and (2) that a grant of permanent custody is in the child's best interest. R.C. 2151.414(B)(1); *see also In re T.J.* at ¶ 36 and *In re A.M.*, 2020-Ohio-5102, ¶ 18.

**{¶ 43}** All of the court's findings under R.C. 2151.414 must be supported by clear and convincing evidence. *In re T.J.* at ¶ 36. "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus; *In re Alexander C.*, 2005-Ohio-6134, ¶ 37 (6th Dist.) ("Clear and convincing evidence is a higher degree of proof than preponderance of the evidence, but a lower degree than beyond a reasonable doubt.").

15.

{¶ 44} The Ohio Supreme Court recently clarified the standard of review in permanent custody cases. In *In re Z.C.*, 2023-Ohio-4703, the court held that, "[g]iven that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, we agree with those appellate courts that have determined that the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate, depending on the nature of the arguments that are presented by the parties." *Id.* at ¶ 11 (Rejecting abuse-of-discretion standard in termination proceeding). Sufficiency of the evidence and manifest weight of the evidence are "distinct concepts and are 'both quantitatively and qualitatively different.'" *Id.* at ¶ 13, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 (1997), paragraph two of the syllabus. "We have stated that 'sufficiency is a test of adequacy,' * * * while weight of the evidence 'is not a question of mathematics, but depends on its *effect in inducing belief*.'" (Emphasis sic.) *Id.,* quoting *Thompkins* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

### A. The trial court's findings under R.C. 2151.414(B)(1)(a) were supported by clear and convincing evidence.

{¶ 45} R.C. 2151.414(B)(1)(a) requires a finding that the child has not been abandoned or orphaned, has not been in the custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and cannot be placed with either parent within a reasonable time or should not be placed

with either parent; subsection (b) requires a finding that the child is abandoned; subsection (c) requires a finding that the child is orphaned and there are no relatives who are able to take permanent custody; subsection (d) requires a finding that the child has been in the temporary custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period; and subsection (e) requires a finding that the child or another child the parent had custody of has been adjudicated abused, neglected, or dependent on three separate occasions.

{¶ 46} In the instant case, the trial court found, with respect to the first requirement, that R.C. 2151.414(B)(1)(a) applied as to both children *and* that Section (B)(1)(d) applied as to Child 2. That is, it found that the children cannot and should not be placed with mother within a reasonable time *and*, as to Child 2, that she has been in the temporary custody of LCCS for 12 or more months of a consecutive 22-month period.

{¶ 47} A finding that Section (B)(1)(a) applies requires a trial court to consider whether the factors enumerated in R.C. 2151.414(E) are present that would indicate that a child "cannot be placed with either parent within a reasonable period of time or should not be placed with the parents." R.C. 2151.414(E); *In re B.K.*, 2010-Ohio-3329, ¶ 42-43 (6th Dist.). "If the court determines, by clear and convincing evidence, . . . that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent[.]" *Id.* The juvenile court need only find the presence of one R.C. 2151.414(E) factor "to support its holding." *In re C.F.*, 2007-Ohio-1104, ¶ 50.

17.

**{¶ 48}** The juvenile court found that Sections (E)(1), (2) and (11) apply as to mother. We address each of those "(E) factors" and the trial court findings below.

### 1. R.C. 2151.414(E)(1)

**{¶ 49}** Under R.C. 2151.414(E), if the court finds that the following condition exists, the court "shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent":

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

**{¶ 50}** In its decision, the juvenile court found that mother failed to remedy the problems that initially caused the removal of the children, specifically that mother (1) "failed to maintain appropriate mental health services;" (2) "has been inconsistent in receiving mental health services since 2017;" (3) "displays verbally aggressive behaviors

18.

toward those that try to provide her help;" and (4) "fails to recognize the severity of her mental health and how it negatively impacts her ability to parent."

{¶ 51} The record unequivocally supports the court's findings. Indeed, this case ended as it began, that is, with mother's serious mental health problems going "untreated." Despite some early success at Ohio Guidestone—which led to mother's reunification with her children—she switched providers (to Family and Child Abuse Prevention Center) and was "discharged" in June 2023 due to her "verbal aggression, dissatisfaction of services and the counselor not feeling safe around [her] anymore." Mother received no care over that summer, which correlates with a series of altercations and confrontations between herself and "apartment managers, doctor's offices, daycares, service providers [and] caseworkers." And, despite agreeing to transfer to a new provider (Unison), she was a "no-show" for a rescheduled appointment on July 27, 2023, and did not receive treatment there. Although mother purportedly returned to Ohio Guidestone in late summer, she did so without a referral and with a self-report that "everything was going well"—which undercuts any claim of a meaningful effort to reengage. As of the trial, mother was receiving "no care."

{¶ 52} Mother claims that she "remedied the issues which caused the children to be removed." We disagree. The children were removed due to mother's untreated mental health conditions, and as set forth above, she did not complete that part of her case plan.

19.

{¶ 53} Mother also claims that, while she may "yell[] when she is stressed," she "then calms down," and there is no evidence that it caused "any actual harm" to the children. But, the caseworker, who "observed [mother's] inability to cope with stressful situations," testified that the children were not safe in mother's care because mother's "mental stability" is not "appropriate enough" to parent children. The CASA also observed "how quickly mother escalates, the screaming, the yelling [which] would affect the children." We reject mother's claim that the agency's concerns were "overblown."

{¶ 54} In sum, the record contains clear and convincing evidence that mother failed "continuously and repeatedly to substantially remedy the conditions" which led to the children's removal under R.C. 2151.414(E)(1). We further find that the trial court's findings are supported by sufficient evidence and not against the manifest weight of the evidence.

### 2. R.C. 2151.414(E)(2)

{¶ 55} Under R.C. 2151.414(E), if the court finds that the following condition exists, the court "shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent":

> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or

for the purposes of division (A)(4) of section 2151.353 of the Revised Code; * * *

{¶ 56} Many of the juvenile court's findings under Section (E)(2) mirror those with respect to Section (E)(1). Thus, the court found that mother "has not been engaged with appropriate mental health services since June of 2023" when she was "unsuccessfully discharged" because the provider had concerns for her own safety, due to mother's "verbal aggression." It noted that mother has also been "verbally aggressive" with LCCS staff, doctor's office staff, an apartment leasing agent, daycare staff, and hospital staff. Other "concerns" identified by the court included "accusations" made by mother that LCCS staff had forged her signature and "illegally entered her apartment." She also threatened to bring charges against LCCS and the children's prior caregiver.

{¶ 57} The court found that mother "refuses" to engage in mental health services, . . . [d]espite LCCS's efforts." And it specifically rejected mother's argument that there was no need for such services, based upon the "no recommendation" made by Ohio Guidestone. The trial court noted that mother completed an assessment there "without a referral from LCCS" and that "LCCS did not have a release of information for Ohio Guidestone at the time."

{¶ 58} Based upon our review of the record, there appears to be an obvious correlation between mother's disengagement from receiving mental health services in June of 2023 and the rise of negative behaviors. During that time, mother was observed to be overwhelmed, angry, accusatory, confrontational, and unable to deescalate. In the

21.

words of the permanency support caseworker, mother appeared unable to "communicate her feelings in a way that wasn't attacking someone else or blaming someone else" and she did not "take responsibility" for her actions.

{¶ 59} Mother's withdrawal from mental health treatment and her assertion that "there is nothing wrong with her," support the juvenile court's finding under Section (E)(2). That is, mother's chronic mental health illness is so severe that it renders her unable to provide an adequate permanent home for the children at the present time and for the foreseeable future. We find that the juvenile court's findings under R.C. 2151.414(E)(2) are supported by sufficient evidence and are not against the manifest weight of the evidence.

### 3. R.C. 2151.414(E)(11)

{¶ 60} Under R.C. 2151.414(E), if the court finds that the following condition exists, the court "shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent":

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, . . . and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

22.

{¶ 61} The juvenile court found that it had previously terminated mother's parental rights to Child 1, the children's older sibling, *and* that mother had failed to provide clear and convincing evidence that, notwithstanding this previous termination of rights, she can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child. The court noted that the prior case involved "concerns related to Mother's mental health and her ability to parent" and that, in the instant cases, mother put forth no evidence that "she is able to effectively manage her mental health or adequately parent her children."

{¶ 62} The record supports these findings. In addition, mother did not testify at trial or present any evidence that she can provide a legally secure permanent placement for Child 2 or Child 3 or adequately care for their health, welfare, and safety. We find that the record supports the trial court's determination by clear and convincing evidence of the existence of factor R.C. 2151.414(E)(11) in this case. We further find that the trial court's finding are supported by sufficient evidence and not against the manifest weight of the evidence. *Accord, In re R.S.,* 2014-Ohio-5815, ¶ 34 (6th Dist.).

### B. The trial court's findings under R.C. 2151.414(B)(1)(d) were supported by clear and convincing evidence.

{¶ 63} Mother does *not* dispute the juvenile court's other finding under Section (B)(1)(d)—i.e., that Child 2 was in LCCS's temporary custody for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1)(d).

23.

{¶ 64} The trial court found that Child 2 was in the temporary custody of LCCS from January 12, 2022 until April 23, 2023 and again from September 30, 2023 until November 16, 2023, for a total of 16 months and 29 days of a consecutive 22-month period. It noted that the criteria set forth in R.C. 2151.414(B)(1)(d) is met where "as here. . . a child was placed in the temporary custody of an agency, was out of agency custody for a time, and later returned to agency custody within a twenty-two—month period." *See, e.g., In re N.M.P.,* 2020-Ohio-1458, ¶ 23.

{¶ 65} "[T]he first prong of the permanent custody test is satisfied where 'one or more' of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e) applies." *In re R.A.,* 2022-Ohio-1748, ¶ 34 (6th Dist.), citing *In re B.C.,* 2018-Ohio-2673, ¶ 16 (12th Dist.) ("To satisfy [the first prong] of the permanent custody test, only one of the [R.C. 2151.414(B)(1)(a) through (e)] findings need be met."). Here, the juvenile court found that Section (B)(1)(a) applies as to both children and that Section (B)(1)(d) applies as to Child No 2. We find that the evidence is sufficient to establish the trial court's findings. Therefore, the first requirement of the statute is met.

## C. The trial court's best interest findings were supported by clear and convincing evidence.

{¶ 66} In determining the best interest of a child, the juvenile court "shall consider all relevant factors, including, but not limited to, the following:"

24.

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e). Here, the record clearly and convincingly supports the juvenile court finding that multiple best-interest factors applied and that they weighed in favor of a grant of permanent custody to the agency.

{¶ 67} Under R.C. 2151.414(D)(1)(a), regarding the children's relationships with others, the juvenile court found that,

> [Child 2 and Child 3] are not bonded to and do not have a relationship with their fathers due to lack of contact and visitation. Although Mother has been consistent with visiting her children and even gained custody back for a short period of time, the children have primarily lived with their current Foster Parent. For the majority of their lives, [Child 2 and Child 3] have lived with their current Foster Parent, who also adopted their older biological sibling. Both the LCCS caseworker and the CASA testified that the children are very bonded to their Foster Parent and refer to her as "mom." The LCCS caseworker testified that when she was driving the children to their original foster home for respite in October 2023, [Child 2] became very excited when she was a few houses away. The children's daycare provider testified that you could tell they were excited to see their Foster Parent when she would pick them up, but they did not display the same enthusiasm towards Mother. The Foster Parent is willing to adopt both children. If Foster Parent is able to adopt both of the children, they will remain together and be able to live with their older biological sibling.

The record supports these findings. Additionally, we note evidence in the record that mother "has very little support" apart from a sister, with whom mother has "issues." By contrast, foster-mother has a "huge family support system."

{¶ 68} Mother concedes that the children are bonded with foster-mother, but she complains that their bond was treated as though it is "more important" than the mother-child bond. She questions "why is it that a child cannot be removed from a **foster home** to be placed into the care of a biological parent due to the child being bonded with foster parent?" (Emphasis in the original.) Of course, the children in this case were removed from foster-mother's care so that they could be *reunified with mother*. Given the evidence of the children's love and affection for foster-mother, we can only speculate that their separation from her was likely difficult, if not traumatic. The fact remains that the agency supported efforts to reunify this family, and unfortunately, mother was unable to manage the stressors that come with full-time parenting. Having reviewed the record, the juvenile court did not err in this finding or by weighing this best interest factor in favor of the grant of permanent custody to LCCS.

{¶ 69} Regarding the best interest factor set forth in R.C. 2151.414(D)(1)(b), which deals with the children's wishes, the juvenile court found that the children "at this time are too young to express their wishes." However, it found that the CASA conducted an "independent investigation" and "believes it is in the children's best interest that permanent custody be awarded to LCCS." We find that this factor weighs in favor of LCCS receiving permanent custody.

{¶ 70} With respect to the best interest factor set forth in R.C. 2151.414(D)(1)(c), the juvenile court reviewed the children's custodial history in this case. That is, the children were placed with "Mother's prior Foster Parent" from their births until they were

27.

temporarily reunified with mother in April of 2023. Following their removal from mother in August of 2023, the children "were place with a new foster family" and later reunited with foster-mother in October of 2023, where the children remained as of the trial. Foster Parent has indicated her willingness to adopt the children. J.E. at 17. Based upon the custodial history in this case, we find that this factor also weighs in favor of LCCS receiving permanent custody.

{¶ 71} In consideration of R.C. 2151.414(D)(1)(d), regarding the need for a legally secure placement, the juvenile court found that the children deserve permanency in an environment that offers them security, stability, and consistency. It found, however, that "at this time, and for the foreseeable future, the children's parents will not be able to provide a secure, stable and consistent environment for them." It included findings that, despite efforts by LCCS to find suitable relatives who might care for the children, "those searches were unsuccessful." It found that the children "should not be required to wait forever" for mother to "alleviate the reasons for removal" and that mother "has made little to no appreciable progress in her case plan services, supporting the fact that reunification cannot occur in a timely manner." Based upon these findings, the juvenile court concluded that a legally secure placement "cannot be achieved without a grant of permanent custody to LCCS."

28.

{¶ 72} Given all the evidence presented in this case, including the CASA's testimony that a grant of permanent custody to LCCS was in the children's best interest, we find that the juvenile court did not err in finding that this factor weighed in favor of a grant of permanent custody.

{¶ 73} Finally, in consideration of R.C. 2151.414(D)(1)(e), regarding whether any of the factors in R.C. 2151(E)(7) to (11) apply in relation to mother, the juvenile court found that "R.C. 2151.414(E)(11) applies to Mother [who] had her parental rights involuntarily terminated in 2019 with respect to an older sibling [in case No. JC17261412]" and that the prior case involved "similar concerns related to Mother's mental health and her ability to parent."

{¶ 74} After carefully reviewing the record in this case, we find that the juvenile court's best interest findings are supported by sufficient, convincing evidence and are otherwise not against the manifest weight of the evidence. Therefore, we find no error in the juvenile court's decision finding that it was in the children's best interest to be placed in the permanent custody of LCCS. Accordingly, the second requirement of the statute is also met.

### III. Conclusion

{¶ 75} For the reasons expressed above, we find that the juvenile court's decision was supported by clear and convincing evidence and was not against the manifest weight of the evidence. We find that mother's assignment of error is without merit. Therefore,

29.

the May 1, 2024 judgment of the Lucas County Court of Common Pleas, Juvenile

Division, is affirmed.  Pursuant to App.R. 24, costs of this appeal are assessed to mother.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.

Gene A. Zmuda, J.

Myron C. Duhart, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.