[Cite as *In re D. Children*, 2025-Ohio-1517.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|                      |   |                       |
|----------------------|---|-----------------------|
| IN RE: D CHILDREN    | : | APPEAL NOS.  C-240682 |
|                      |   |                    C-250042 |
|                      | : | TRIAL NO.    F/08/1521 X |
|                      | : |                       |
|                      | : | *O P I N I O N*       |

Appeals From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: April 30, 2025

*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *Marin Cofrancesco*, Assistant Prosecuting Attorney, for Appellant/Cross-Appellee Hamilton County Department of Job and Family Services,

*James Fantetti*, for Appellee/Cross-Appellant Mother,

*Jon Sinclair*, for Appellant Father,

*Paul Hunt*, for Appellee Guardian Ad Litem,

*Treleven & Klingensmith LLC* and *Celia Klug Weingartner*, for Appellee Minor Children.

**NESTOR, Judge.**

**{¶1}** Between 2008 and 2022, the three children at the center of this case have, at various times, been in Father's custody, Mother's custody, and Hamilton County Job and Family Services' ("HCJFS") custody. However, the particular case before us now began in March 2022, when HCJFS removed all three children from Mother's home after the juvenile court remanded custody to her only two months prior. HCJFS received a report that the two younger children, D.D. and J.D., were exhibiting concerning behaviors at school and D.D. was not receiving his medication and was not engaging in therapy.

**{¶2}** HCJFS filed for permanent custody of all three children, but after adjudication and disposition, the juvenile court ultimately remanded custody to Mother. HCJFS now appeals to this court, arguing that the juvenile court's decision was not supported by sufficient evidence and was against the manifest weight of the evidence. After reviewing the record, we overrule HCJFS's sole assignment of error and affirm the juvenile court's judgment. Mother and Father raise assignments of error that are resolved by our decision as to HCJFS's assignment of error.

## I. Factual and Procedural History

**{¶3}** While the extensive history of this case is not entirely pertinent to the appeal before us, we think it provides an important backdrop. Mother and Father were not in a relationship with one another, and in 2008, Father gained full custody of N.D., Father and Mother's oldest child. Then, almost eight years later, Father gained custody of all three children that he shared with Mother—N.D., D.D. and J.D—and the juvenile court issued orders of protective supervision at the same time. It was not until 2019 that Mother had custody of the children. At some point in 2019, the children alleged that Father sexually abused them throughout their lives, which prompted

HCJFS to file another emergency order of custody. In the latter six months of 2021, the children lived with Mother again, and in October 2021, she filed to terminate HCJFS's temporary custody. In January 2022, the juvenile court remanded custody of the children to Mother and closed that case. It is the events that took place after January 2022 that form the basis of this appeal.

**{¶4}** It is important to note that Mother is diagnosed with Bipolar Disorder I and has continuously struggled to maintain her mental health. Additionally, all three children have varying mental health diagnoses. D.D. and J.D. have severe mental health issues that require medication and intense therapeutic services. Only two months after the juvenile court remanded custody to Mother, D.D. expressed suicidal and homicidal ideations while at school on March 17, 2022, which prompted an individual to report the instance to HCJFS. HCJFS then discovered that the children's insurance lapsed. Mother failed to notify the insurance company of the custodial change, resulting in D.D. being unable to obtain his much-needed medication, and HCJFS discovered that D.D. was not engaging in therapy for his mental health. On the afternoon of March 18, 2022, HCJFS workers went to Mother's home, where they found D.D., who Mother had kept home from school due to the previous day's events.

**{¶5}** Mother was understandably upset when HCJFS workers informed her of the complaint and the agency's plan to take emergency custody of all three children. HCJFS took D.D. at that point, and Mother eventually dropped J.D. and N.D. off at the agency later that day. As part of its original action, HCJFS filed a complaint on March 21, 2022, for permanent custody of all three children, claiming that they were dependent and neglected. The juvenile court granted the emergency order and eventually granted HCJFS temporary custody of the children while the case was ongoing. The children were placed in three different foster homes, and J.D. and D.D.

3

began attending therapy consistently again.

**{¶6}** HCJFS's initial case plan cited concerns for Mother's mental health and her ability to care for the children's mental health at the same time she cared for her own, and Mother's ability to provide a stable home environment for the children.[1] In September 2022, the magistrate adjudicated all three children to be dependent and D.D. to be neglected (all of which the juvenile court adopted over Mother's objections). In the interim between the adjudication and disposition stages, a relative filed a motion seeking legal custody of N.D. After more testimony from D.D.'s and J.D.'s therapists and the HCJFS caseworker, the magistrate ultimately granted permanent custody of D.D. and J.D. to HCJFS and granted the request to place N.D. in a "Planned Permanent Living Arrangement."

**{¶7}** Mother objected to the magistrate's ruling regarding the custody of D.D. and J.D., and she moved to have the juvenile court reopen the case in order to offer State Automated Child Welfare Information System ("SACWIS") records into evidence. The juvenile court denied Mother's motion to reopen the case, but it refused to adopt the magistrate's decision and remanded custody to Mother. In doing so, it acknowledged Mother's shortcomings in treating her own mental health and her involvement with D.D.'s and J.D.'s mental health providers, but it recognized her willingness to address those concerns and her commitment to caring for her children.

**{¶8}** HCJFS now appeals to this court, asserting a single assignment of error, arguing that the juvenile court's decision to remand custody of D.D. and J.D. to Mother

---

[1] At oral argument, Mother's counsel alleged that HCJFS never filed a case plan in this case. However, the record shows that HCJFS originally filed a case plan in this action, but it dismissed the original complaint and refiled an identical one (to comply with statutory time constraints for adjudication and disposition) without ever refiling the case plan (which Mother already had possession of). Mother's counsel did not raise this issue below until after adjudication and he had possession of the plan. Furthermore, there is no developed argument in Mother's appellate brief on this point. Therefore, it is not at issue in this appeal.

was against the manifest weight of the evidence and was not supported by sufficient evidence. Father asserted a single assignment of error, claiming that the juvenile court erred in its decision to remand custody to Mother, but he does so under an abuse of discretion standard of review. Mother also puts forth her own assignment of error, arguing that the juvenile court abused its discretion in denying her motion to reopen the case. We address only HCJFS's assignment of error, as it is dispositive.

## II. HCJFS's Assignment of Error

**{¶9}** "[T]he statutory findings in permanent-custody proceedings must be based upon 'clear and convincing evidence.'" *In re S/F Children*, 2025-Ohio-822, ¶ 36 (1st Dist.), quoting R.C. 2151.414(B)(1) and (E). Clear and convincing evidence is less than evidence "beyond a reasonable doubt" and more than a "preponderance of the evidence." *Id.*, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. In reviewing such decisions, we examine the record to ensure that "'the [juvenile court] had sufficient evidence before it to satisfy the requisite degree of proof,'" and in doing so, we apply the sufficiency of the evidence and/or the manifest weight of the evidence standards of review, "depending on the nature of the arguments [] presented by the parties." *In re Z.C.*, 2023-Ohio-4703, ¶ 8 and 11, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990); *see In re A.H.*, 2024-Ohio-5485, ¶ 55-56 (8th Dist.) (applying the holding in *Z.C.* to actions under R.C. 2151.353(A)(4)). HCJFS now raises arguments under both standards.

**{¶10}** Determining whether a juvenile court's permanent custody decision is supported by sufficient evidence is a question of law and a test of adequacy. *Z.C.* at ¶ 13, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), paragraph two of the syllabus. "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when the evidence is legally sufficient to support the

[decision] as a matter of law." (Internal citations omitted.) *Id.*, quoting *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 3, quoting *Thompkins* at 386, quoting *Black's Law Dictionary* (8th Ed. 2004). On the other hand, a manifest weight of the evidence standard requires us to "weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed." *Id.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. In doing so, "'[we] must always be mindful of the presumption in favor of the finder of fact.'" *Id.*, quoting *Eastley* at ¶ 21. In other words, "[s]ufficiency pertains . . . to the *burden of production*," whereas "[m]anifest-weight challenges . . . concern the *burden of persuasion*." (Emphasis in original.) *S/F Children* at ¶ 37-38, citing *In re A.B.*, 2015-Ohio-3247, ¶ 15 (1st Dist.).

{¶11} Because HCJFS requested permanent custody of the children as part of its original action, R.C. 2151.353 applies. *In re W.R.*, 2012-Ohio-382, ¶ 30 (12th Dist.). HCJFS argued that it should have been granted permanent custody of the children pursuant to R.C. 2151.353(A)(4). That section states that the juvenile court may grant permanent custody to an agency "if the court determines in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parent within a reasonable time or should not be placed with either parent and determines in accordance with division (D)(1) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child." R.C. 2151.353(A)(4).

### A. *Whether the Children Cannot or Should Not Be Placed With Mother*

### i. *The Juvenile Court's Findings*

{¶12} We must first determine whether the juvenile court's finding that none of the factors in division (E) of R.C. 2151.414 apply in this case was supported by sufficient evidence and was not against the manifest weight of the evidence. In the trial court (and now), HCJFS argued that factors (E)(1), (2) and (4) are present in this case, which state

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> (2) Chronic mental illness . . . of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing . . . for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

. . .

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child. . . .

R.C. 2151.414(E).

**{¶13}** As it pertained to factor (E)(1), the juvenile court noted that when HCJFS originally removed the children from Mother's home it was concerned with (1) Mother's ability to maintain her own mental health while meeting the children's demanding mental health needs, (2) the mental and behavioral health of the children, and (3) Mother's ability to provide a stable and secure environment for the children. The case plan filed by HCJFS emphasized that Mother needed to complete a "Diagnostic Assessment of Functioning," engage with a therapist, and take medication to properly treat her mental health. HCJFS also required Mother to maintain stable housing and employment, and it required her to attend and participate in the children's mental health team appointments. Later in the case, HCJFS added an additional requirement that she participate in toxicology screenings.

**{¶14}** The juvenile court found that Mother inconsistently participated in the toxicology screenings, but also that they were "largely unnecessary" because Mother's behavioral issues were likely explained by her mental health diagnoses. Therefore, the court did not find that point "to be persuasive of a need" to grant permanent custody to HCJFS. The juvenile court also understood that while Mother did not reach out to each child's care teams regarding their treatment and progress, it recognized her "commitment to show up," as shown by her ability to identify what her children's needs are and the appropriate action to take. It also noted that the facilities where the

8

children attended treatment only reached out to the foster parents regarding D.D.'s treatment and that Mother would have been unable to receive any information about J.D.'s treatment because there was not a release of information form on file. Based on those findings, the juvenile court decided that Mother had adequately addressed HCJFS's initial concerns, and therefore, factor (E)(1) did not apply.

{¶15} In considering factor (E)(2), HCJFS highlighted Mother's severe mental health diagnosis and her inconsistency in receiving her prescribed injection medication and attending therapy. While the juvenile court acknowledged and somewhat shared those concerns, it recognized that Mother regularly took her oral medication and reengaged with her therapists and more consistently received her injections as the case progressed. The juvenile court thus found that factor (E)(2) did not apply.

{¶16} Lastly, the juvenile court concluded that factor (E)(4) was not present in this case because Mother "regularly support[ed], visit[ed], and communicate[d]" with the children. She consistently participated in the weekly supervised visitations, which progressed from the supervising entity's facility to her home and eventually visitations in the community. The juvenile court also acknowledged a minor issue that arose when visitations initially began, but that it was not an ongoing issue.

{¶17} HCJFS did not assert that any other factors in division (E) applied in this case, so the juvenile court's findings recounted above were conclusive as to the first prong in R.C. 2151.353(A)(4). In other words, the juvenile court did not find that the children could not or should not be placed with Mother within a reasonable amount of time under factors (E)(1), (2), or (4).

### ii. Sufficiency and Manifest Weight

{¶18} The juvenile court's decision was supported by sufficient evidence and

likewise was not against the manifest weight of the evidence.

**{¶19}** First, as it pertains to factor (E)(1), Abbey Turner (the HCJFS caseworker assigned to this case) testified that Mother consistently engaged with her case manager and engaged in her medication management, both of which were recommended by her case plan. Ms. Turner also stated that when Mother missed her therapy appointment, she noted her intention of getting rereferred so that she could begin attending again. Evidence also showed that Mother regularly took her oral medication to address her mental health and that she did receive her injection medication several times throughout this case (albeit inconsistently). Thus, Mother worked to address HCJFS's initial concerns regarding her management of her own mental health.

**{¶20}** Additionally, as stated above, HCJFS was concerned with Mother's ability to provide a stable environment for the children. Greater Cincinnati Behavioral Health documentation noted, and Ms. Turner testified, that Mother obtained stable employment and housing during the pendency of the case. Furthermore, Ms. Turner stated that she did not have any concerns about the safety of Mother's home. In fact, she testified that she felt comfortable remanding custody of the children to Mother in early 2022 because the children did well at her home between July 2021 and early 2022, which indicates Mother's *ability* to provide the safe and stable environment that HCJFS desires for the children.

**{¶21}** HCJFS also notes that Mother's case plan required her to participate in toxicology screenings. However, substance abuse was not an initial concern of HCJFS when it removed the children from her home, and that requirement was not added until later in this case. Therefore, her failure to participate in these screenings does not lend support to the conclusion that she failed to address HCJFS's *initial* concerns,

and thus, it does not provide any support for HCJFS's position under factor (E)(1).

**{¶22}** The main concern for HCJFS at the initial stages of this case was Mother's ability to maintain the children's mental health needs. The children are both diagnosed with severe mental health conditions that require consistent treatment and administration of medication. Shortly after the children were remanded to Mother's care in January 2022, their insurance lapsed and D.D. was unable to obtain necessary medications, which resulted in him having suicidal and homicidal ideations. However, at the time of the lapse, Mother had attempted to notify the insurance carrier of the change in custody from HCJFS to her, but she had trouble doing so because she did not receive the proper documentation from HCJFS notating the change in custody in time to avoid this lapse. Thus, the lapse was not a result of her lack of care for the children's needs but was due to the difficulties navigating the insurance system.

**{¶23}** Additionally, both children's care providers stated that Mother did not reach out to either of them to stay updated on the children's progress in treatment, and that she did not regularly attend D.D.'s care-team meetings. However, J.D.'s therapist stated that Mother would have been unable to obtain that information because there was no release form on file, and D.D.'s provider never reached out to Mother, as they only initiated contact with his foster mother to provide those pertinent updates. Mother did miss several meetings with D.D.'s care team, but Ms. Turner testified that Mother reached out at least once to ask for the documentation from one of those meetings regarding D.D.'s medication. Most importantly, testimony showed that Mother was the one that initiated D.D.'s care at Best Point. She originally reached out to the facility a previous time to get D.D. into treatment when he struggled with his mental health. Furthermore, Mother expressed her desire to do what she needed to in order to provide for her children's needs. Ms. Turner stated that when Mother

said she was going to do something or be somewhere, she was more than likely going to do so. She also expressed that previously, when the children were in Mother's care, Mother would reach out to her if she needed any help, which demonstrates her ability to identify and address her children's needs. Several individuals testified that the children could still participate in the same treatment if they were remanded to Mother's care, and all of the evidence above demonstrates her willingness and ability to meet the needs of her children while caring for her own mental health.

**{¶24}** While Mother did not meet every single requirement in her case plan, she substantially remedied HCJFS's initial concerns. *See In re Adjudicated Dependent*, 2025-Ohio-681, ¶ 55 (4th Dist.), quoting *In re J.B.*, 2013-Ohio 1704, ¶ 90 (8th Dist.), quoting *In re McKenzie*, 1995 Ohio App. LEXIS 4618, *4 (9th Dist. Oct. 18, 1995) ("The issue is not whether the parent has substantially complied with the case plan, but whether the parent has substantially remedied the conditions that caused the child's removal." (Cleaned up.)). Thus, the juvenile court's findings under factor (E)(1) were supported by sufficient evidence and were not against the manifest weight of the evidence, as there was ample evidence showing that Mother remedied HCJFS's initial concerns.

**{¶25}** Second, the evidence recounted above also supports the juvenile court's findings under factor (E)(2) that Mother's mental health was not so severe that she could not provide an adequate and secure home for the children. Mother consistently took her oral medication that was prescribed to address her diagnoses. While she did so inconsistently, she also expressed her desire to address her mental health through therapy (indicating that she was going to get rereferred) and her injection medication. Mother's acknowledgement of and willingness to address her mental health does not support HCJFS's assertion that the children cannot be placed with her under factor

(E)(2). *See In re Jaz. M.*, 2024-Ohio-5413, ¶ 56-59 (6th Dist.) (holding that mother's refusal to engage in mental health services, her disengagement from the services, and her failure to acknowledge that she even had a mental illness, all correlated with a rise in her negative behaviors towards others, and supported the juvenile court's finding in favor of HCJFS under factor (E)(2)). Here, Mother never fully disengaged from services, nor has she ever indicated that she does not believe that she cannot benefit from such services. The evidence that Mother has taken steps to address her mental health provides sufficient support for the juvenile court's finding under factor (E)(2), which is likewise not against the manifest weight of the evidence.

{¶26} Lastly, factor (E)(4) states that the children cannot or should not be placed with Mother within a reasonable amount of time if she "has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child . . . or by other actions showing an unwillingness to provide an adequate permanent home for the child." R.C. 2151.414(E)(4). Evidence showed, and Ms. Turner testified, that Mother *never* missed a visit with her children by her own volition. Any issues related to missed visits were due to transportation issues with the children. As stated previously, Mother has also indicated her commitment to meeting the needs of her children if she regains custody. Thus, the juvenile court's findings under this factor were supported by sufficient evidence and were not against the manifest weight of the evidence.

### iii.

{¶27} There is evidence supporting each party's position, and the juvenile court even acknowledged and shared some of HCJFS's concerns. However, even ""[i]f the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most

favorable to sustaining the verdict and judgment.""" *Z.C.*, 2023-Ohio-4703, at ¶ 14, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, fn. 3 (1984), quoting 5 Ohio Jur.3d, Appellate Review, § 603, at 191-192 (1978). This is not a case where the juvenile court "created 'a manifest miscarriage of justice.'" *See S/F Children*, 2025-Ohio-822, at ¶ 38 (1st Dist.), quoting *In re B.J.*, 2021-Ohio-373, ¶ 14 (1st Dist.). There is certainly competing evidence, but that is not enough to say that the juvenile court's decision was against the manifest weight of the evidence. Furthermore, Mother produced enough competent and credible evidence to support her position, and thus, the juvenile court's decision. *See id.* at ¶ 37, citing *In re A.Y.C.*, 2023-Ohio-4494, ¶ 34 (1st Dist.) ("Sufficiency pertains, in essence, to the *burden of production* . . . . In our sufficiency review, we accept the juvenile court's underlying factual determinations if supported by competent and credible evidence.").

**{¶28}** Based on the foregoing analysis and the evidence discussed, HCJFS failed to show how the juvenile court erred in its decision under the first prong of R.C. 2151.353(A)(4).

### B. Best Interest of the Children

**{¶29}** Even though the juvenile court did not err in its findings under the first prong of R.C. 2151.353(A)(4) (and thus, we are not required to reach the second prong), we will still consider HCJFS's assertions as to the children's best interest.

### i. The Juvenile Court's Findings

**{¶30}** When considering the best interest of the children under R.C. 2151.414(D)(1), the juvenile court considered

(a) The interaction and interrelationship of the child with the child's

parents, siblings, relatives, foster caregivers and out-of-home providers,

and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶31} HCJFS does not refute that none of the factors in (E)(7) to (11) apply in this case. Therefore, we focus on the first four factors.

{¶32} Under the first consideration, the juvenile court highlighted that the children and Mother have a mutual bond and they "both care for each other and care about each other's health and safety." It noted that, at the time, the children resided in different living arrangements, but that they had the opportunity to continue seeing each other at their weekly visits and that they would be able to do so in the future to maintain their bond. It also acknowledged that the children each have strong bonds

with their respective foster families. Therefore, the juvenile court seemingly decided that this factor did not weigh in either party's favor.

**{¶33}** The juvenile court highlighted that the second factor weighed in favor of remanding custody of the children to Mother, as each child had consistently stated that they wished to return to Mother throughout the duration of the case, which conflicted with the guardian ad litem's ("GAL") recommendation. As to the third consideration, the juvenile court noted the *extensive* custodial history of the children and determined that the children had been in the custody of HCJFS for 27 consecutive months, which favored HCJFS's position. Lastly, the juvenile court shared HCJFS's concerns about Mother's ability to provide a stable home, considering the fact that the children require intense therapy and consistent treatment. However, it decided that Mother could provide a legally secure placement for her children and meet their needs, as she "has demonstrated her care for the children, her ability to meet her own mental health needs and those of her children, and that she can provide a stable home and income for them." It also noted her ability to receive support from HCJFS if she were to regain custody, somewhat remedying concerns that she may have difficulty meeting their needs.

### ii. *Sufficiency and Manifest Weight*

**{¶34}** Several individuals testified that the children both felt safe with their foster families, that they both indicated they were happy with their respective foster families, and that they were both bonded with their foster families. However, they also testified that the children had good relationships with Mother, that they felt safe with her, that they expressed their desire for her to be safe, and that they always looked forward to their visits with her. As noted previously, Mother never missed her weekly visits with her children, and this consistent involvement lends support to the juvenile

court's dispositional findings. *See In re J.C.*, 2024-Ohio-5107, ¶ 36 (10th Dist.) (explaining that because mother failed to visit her children consistently, her visits would sometimes result in yelling and flipping of furniture between the children with little intervention from her, and she was not bonded to her children, the first factor weighed in favor of the agency). Ms. Turner stated that the children are all bonded with one another, but none of them resided in the same foster home at the time of the dispositional hearings. Therefore, evidence demonstrated that the children had good relationships with each other, their foster families, and Mother. This factor does not weigh heavily in favor of HCJFS or Mother, but there is ample evidence supporting Mother's position and accordingly the juvenile court's ultimate determination on the best interest issue.

**{¶35}** Second, evidence showed that throughout the duration of the case, the children unwaveringly stated that they wished to return to Mother's home, which conflicted with the GAL's recommendation that HCJFS receive permanent custody. Under R.C. 2151.414(D)(1)(b), the juvenile court was permitted to consider the children's wishes directly or as expressed through the GAL, with due consideration of the maturity of the children. In this case, the juvenile court's ultimate disposition and best interest decision aligned with the children's wishes. There is not an exact age at which children reach "maturity" under the statute, but other cases suggest that children that are *much* younger have not reached that status, and thus, their wishes must be expressed through a GAL. *See In re R.A.*, 2021-Ohio-4126, ¶ 52 (8th Dist.) (explaining that the children, aged five, three, and one years old were too young to express their wishes to the court directly). At the time of the dispositional proceeding, the children were approximately 12 and 14 years of age, which is far different than the children in *R.A.* The children were consistent in their wishes, and they were seemingly

"mature" enough to express those wishes directly. Therefore, these findings lend support to the juvenile court's ultimate determination that remanding custody to Mother is in the children's best interest.

**{¶36}** As to the third consideration, the children's custodial history dates back to 2008. In this instance, HCJFS removed the children from Mother's home on March 18, 2022. Per R.C. 2151.414(D)(1), they are considered to have entered the temporary custody of HCJFS on May 17, 2022, and they remained in the agency's custody at the time of the magistrate's dispositional decision on June 21, 2024. This evidence supports HCJFS's position on this point due to the amount of time the children were in HCJFS custody.

**{¶37}** Lastly, evidence outlined above supports the juvenile court's determination that Mother could provide a legally secure placement. She obtained stable employment and housing, she expressed a desire to and did address her mental health issues, she demonstrated her commitment to providing adequate care for her children by seeking care for them when she needed to (e.g., when she initiated care for D.D. at Best Point and when she reached out to HCJFS for resources), and she had previously provided such stability in late 2021, per Ms. Turner. All of that lends support to the juvenile court's ultimate determination.

### iii.

**{¶38}** Again, while there is certainly competing evidence, that does not necessarily mean that the juvenile court erred in reaching its decision. *See S/F Children*, 2025-Ohio-822, at ¶ 38 (1st Dist.), quoting *B.J.*, 2021-Ohio-373, at ¶ 14 (1st Dist.) ("'"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."'"). Additionally,

18

even though there may be competing evidence, the evidence recounted above demonstrates that there was *more* than sufficient evidence supporting the juvenile court's decision.

**{¶39}** For those reasons and the reasons stated in subsection (A)(iii) of this opinion, we overrule HCJFS's sole assignment of error.

### III.  Father's Assignment of Error

**{¶40}** Father separately appeals and argues that the juvenile court abused its discretion when it did not adopt the magistrate's decision.  However, the Ohio Supreme Court held that the sufficiency and manifest weight of the evidence standards apply in such cases, not an abuse of discretion standard (even though that is generally the standard for reviewing a trial court's decision to adopt or not adopt a magistrate's decision). *See Z.C.*, 2023-Ohio-4703, at ¶ 11.  Beyond the standard of review, Father's assignment of error is resolved in the discussion of HCJFS's assignment and it is overruled, as he puts forth the same arguments as to why the juvenile court erred. Other statements regarding Mother's involvement in Father's ongoing criminal case are not at issue in this appeal.

### IV.  Mother's Assignment of Error

**{¶41}** Mother's sole assignment of error asserting that the juvenile court erred in denying her motion to reopen the case so that her counsel could offer the SACWIS records into evidence is rendered moot by our disposition of HCJFS's assignment of error.

### V.  Conclusion

**{¶42}** For the foregoing reasons, we overrule HCJFS's sole assignment of error and Father's assignment of error and affirm the judgment of the juvenile court, which renders Mother's assignment of error moot.

Judgment affirmed.

**ZAYAS, P.J.,** and **MOORE, J.,** concur.


Please note:

The court has recorded its entry on the date of the release of this opinion.