[Cite as *In re B.J.*, 2021-Ohio-373.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: B.J. | : | APPEAL NOS. C-200372 |
| | | C-200376 |
| | : | TRIAL NO. F18-835Z |
| | : | *O P I N I O N.* |

Appeals From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Reversed and Cause Remanded

Date of Judgment Entry on Appeal:  February 10, 2021

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Alyssa M. Miller*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Kathleen Kenney*, Assistant Public Defender, for Appellee Guardian ad Litem,

*Jeffrey J. Cutcher*, for Appellant Mother,

*Barr, Jones & Associates* and *Christopher Sawyer*, for Appellant Maternal Grandfather.

**MYERS, Judge.**

{¶1} Both mother and maternal grandfather have appealed the trial court's entry granting permanent custody of B.J. to the Hamilton County Department of Job and Family Services ("HCJFS"). Because we find that the trial court's determination that a grant of permanent custody was in B.J.'s best interest was not supported by sufficient evidence, we reverse the trial court's judgment.

### *Factual and Procedural Background*

{¶2} HCJFS filed a complaint seeking temporary custody of B.J. on June 11, 2018, several days after B.J.'s birth. The agency was awarded an interim order of temporary custody pending a full hearing on the complaint, and B.J. was placed in a foster home. An amended complaint for temporary custody was filed on June 22, 2018, alleging that B.J. was abused and dependent and that mother had severe mental-health issues and posed a threat to B.J.

{¶3} On July 10, 2018, a juvenile court magistrate issued an order directing that a home study be completed on maternal grandfather, who resided in Nebraska, pursuant to the Interstate Compact on the Placement of Children ("ICPC"). The initial case plan for B.J. filed by HCJFS indicated that maternal grandfather had been in contact with the agency and was willing to work with ICPC to take placement of B.J.

{¶4} Following an adjudication and disposition hearing, B.J. was adjudicated dependent and HCJFS's motion for temporary custody was granted. The magistrate dismissed the allegation of abuse.

{¶5} On December 13, 2018, HCJFS filed a "Semi-Annual Administrative Review." The review indicated that a home study had been completed on maternal grandfather, but that he still needed to undergo a background check prior to being approved to care for B.J.

{¶6} On March 19, 2019, HCJFS filed a motion to modify temporary custody to permanent custody, alleging that B.J. could not or should be placed with either parent within a reasonable time and that a grant of permanent custody was in B.J.'s best interest. Maternal grandfather subsequently filed a petition for custody of B.J. and a motion to remand B.J. into his custody. And both maternal grandfather and mother filed motions to extend temporary custody. B.J.'s guardian ad litem filed a report recommending that permanent custody be granted to HCJFS.

{¶7} A hearing was held before a juvenile court magistrate on these competing motions. HCJFS caseworker Amber Mingo-Foggie testified that mother was listed as an absent parent in B.J.'s case plan due to consistent noncontact with the agency. HCJFS had requested that mother undergo mental-health services and engage with the agency, but she failed to do so. Mother told Mingo-Foggie that she had moved to Nebraska and was engaged in mental-health services there, but she failed to sign a release of information so that HCJFS could obtain documentation of these services. L.E. was established as the legal father of B.J., but he did not participate in the proceedings and never visited with B.J. or provided child support.

{¶8} Mingo-Foggie testified that B.J. has been in the same foster home since birth, that B.J. was bonded with her foster family, and that it was a foster-to-adopt placement. Mingo-Foggie further testified that she believed a grant of permanent custody was in B.J.'s best interest, and that HCJFS was not in support of

a grant of custody to maternal grandfather, who had only visited with B.J. twice since her birth. HCJFS had concerns that maternal grandfather would be unable to adequately protect B.J. because he had a guardianship over mother, whom the agency had not approved to visit B.J. because of her mental-health issues. This concern over maternal grandfather's ability to protect B.J. was based on a statement that maternal grandfather made to Mingo-Foggie indicating that he hoped mother would return to Nebraska if B.J. was placed in his care. Mingo-Foggie testified that an ICPC home study had been completed and that it approved of maternal grandfather's home for placement of B.J.

{¶9} Maternal grandfather testified that he lived in Omaha, Nebraska. He was currently unemployed after losing his job due to his travel to Ohio for the custody proceedings, but he had a job waiting for him upon his return to Nebraska. Maternal grandfather indicated that mother had lived with him for several weeks when she first moved back to Nebraska. He explained that he was mother's legal guardian, and that he had allowed mother to live with him while he obtained medication and alternate housing for her. He introduced into evidence a lease documenting mother's residence in Salvation Army housing. Maternal grandfather addressed HCJFS's concerns that he would be unable to protect B.J. from mother, testifying that if mother attempted to see B.J. without court approval he would call 911 or the Board of Mental Health for assistance. He explained that he had a room for B.J. set up in his home.

{¶10} Darryl Summers, brother of maternal grandfather, testified that he had no concerns with maternal grandfather's ability to provide a safe and loving home for

B.J. He described maternal grandfather as a very positive and ethical individual who was constantly helping his church and community.

{¶11} During closing arguments, counsel for mother stated that mother was in favor of B.J. being placed with maternal grandfather. The magistrate issued a decision finding that neither parent was appropriate to care for B.J., and that an extension of temporary custody to HCJFS and placement with maternal grandfather was in B.J.'s best interest. The magistrate accordingly granted the motions for extensions of temporary custody and denied HCJFS's motion to modify temporary custody to permanent custody.

{¶12} Both HCJFS and B.J.'s guardian ad litem filed objections to the magistrate's decision. The trial court issued an entry granting the objections and rejecting the magistrate's decision after finding that it was not supported by the evidence. The court held that it was undisputed that B.J. could not or should not be placed with either parent within a reasonable time, and that a grant of permanent custody was in B.J.'s best interest. The trial court granted HCJFS's motion to modify temporary custody to permanent custody and denied the competing motions filed by mother and maternal grandfather.

### *Best-Interest Analysis*

{¶13} Both mother and maternal grandfather have appealed. Each raises a single assignment of error challenging the sufficiency and the weight of the evidence supporting the trial court's determination that a grant of permanent custody was in B.J.'s best interest.

{¶14} A juvenile court's determination on a motion for permanent custody must be supported by clear and convincing evidence. *In re W Children*, 1st Dist.

Hamilton No. C-180620, 2019-Ohio-690, ¶ 34. Clear and convincing evidence is evidence sufficient to "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42. In reviewing a juvenile court's determination on a permanent-custody motion, we must examine the record and determine if the juvenile court had sufficient evidence before it to satisfy the clear-and-convincing standard. *In re W Children* at ¶ 34. In reviewing a challenge to the weight of the evidence, we review the record to determine whether the trial court lost its way and created such a manifest miscarriage of justice in resolving conflicts in the evidence that its judgment must be reversed. *In re J.W. and H.W.*, 1st Dist. Hamilton No. C-190189, 2019-Ohio-2730, ¶ 13.

{¶15} Under R.C. 2151.414(B), a trial court may grant permanent custody if it finds that a grant of permanent custody is in the child's best interest and that one of the conditions in R.C. 2151.414(B)(1) applies. *In re H.R.H.*, 1st Dist. Hamilton No. C-200071, 2020-Ohio-3160, ¶ 16. Here, the trial court found that under R.C. 2151.414(B)(1)(a), B.J. could not or should not be placed with either parent within a reasonable time and that a grant of permanent custody was in B.J.'s best interest. Neither mother nor maternal grandfather challenge the trial court's determination that B.J. could not or should not be placed with either parent within a reasonable time. Rather, both challenge the trial court's finding that a grant of permanent custody was in B.J.'s best interest.

{¶16} In determining whether permanent custody is in a child's best interest, the juvenile court must consider all relevant factors, including: (a) the child's interaction with parents, siblings, relatives, foster caregivers and out-of-home

6

providers, and any other person who may significantly affect the child; (b) the child's wishes; (c) the custodial history of the child; (d) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody; and (e) whether any of the factors under R.C. 2151.414(E)(7) to (E)(11) apply. *See* R.C. 2151.414(D)(1)(a)-(e). When considering these best-interest factors, "[n]o single factor is given greater weight or heightened significance." *In re P.*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, ¶ 35.

{¶17} With respect to the factor in R.C. 2151.414(a), the trial court found that B.J. had been placed with the same foster family since birth and that she was well bonded with that family. The court also recognized that maternal grandfather had visited with B.J. twice and that the visits had gone well. In considering the factor in R.C. 2151.414(b), the trial court found that B.J. was too young to express her own wishes, but that her guardian ad litem was in favor of a grant of permanent custody.

{¶18} As to the factor in R.C. 2151.414(c), which required the trial court to consider B.J.'s custodial history, the trial court found that B.J. had been in the temporary custody of HCJFS for more than 12 months of a consecutive 22-month period, and had been in agency custody nearly her entire life.

{¶19} With respect to the factor in R.C. 2151.414(D)(1)(d), the trial court found that B.J. was in need of a legally secure placement. It recognized that an ICPC home study had approved maternal grandfather for placement, but stated that it had concerns about maternal grandfather's ability to be both the legal guardian for mother and B.J. And last, under the factor set forth in R.C. 2151.414(D)(1)(e), the

7

trial court cited division (E)(10) of R.C. 2151.414 to find that both parents had abandoned B.J.

{¶20} The trial court's findings under the best-interest factors set forth in R.C. 2151.414(D)(1)(a), (b), and (e) were supported by sufficient evidence. As to its finding under R.C. 2151.414(D)(1)(c) regarding B.J.'s custodial history, the trial correctly noted that B.J. had been in agency custody almost her entire life. But as to its finding that B.J. had been in agency custody for 12 or more months of a consecutive 22-month period, we note that B.J. had only been in agency custody for approximately seven and a half months at the time that the motion for permanent custody was filed.

{¶21} While, under the factor set forth in R.C. 2151.414(D)(1)(d), B.J. is clearly in need of a legally secure placement, we are troubled by the trial court's finding that maternal grandfather lacked the ability to serve as a guardian for both mother and B.J. This finding was based on speculation. B.J. has yet to be placed in maternal grandfather's care, and he accordingly has never been in the position to protect B.J. from mother or failed to do so. Maternal grandfather's testimony, in fact, supported a finding that he would not hesitate to protect B.J. and would call 911 or the Board of Mental Health if needed to protect her from mother. The record contains no evidence indicating that maternal grandfather's guardianship over mother would impair his ability to protect B.J.; rather, it indicates that maternal grandfather is a loving parent who is concerned about his daughter—mother—but who is willing to put the needs of B.J. first.

{¶22} Maternal grandfather has expressed an interest in caring for B.J. since her birth. He traveled to Ohio from Nebraska multiple times for the court

proceedings and has filed petitions for B.J.'s custody. While his visits with B.J. have been few, they have indisputably gone well. Maternal grandfather also fully participated with the ICPC home-study process. The home study completed on maternal grandfather indicates that he, along with his wife, are responsible for their teenage son who is in high school and has plans to study business in college, and who is involved in the family's church. Maternal grandfather has a steady income and a safe home where B.J. will have her own bedroom. He also has a strong family support system, including his brother Darryl Summers who testified at trial. The home study approved of maternal grandfather's home for placement of B.J., stating that:

> [Maternal grandparents] appear to be caring, kind, and compassionate people. They have a safe, stable home and a steady source of income. They have a good support network of family and church members. [Grandmother] is unemployed, which allows her time to care for the needs of an infant. [Grandparents] have a good understanding of their daughter's mental health needs and are able to establish strong boundaries with her, in order to maintain [B.J.'s] safety and well-being.

{¶23} The record demonstrates that a legally secure placement for B.J. could be obtained with maternal grandfather. We therefore find that the trial court's determination that a grant of permanent custody to HCJFS was in B.J.'s best interest was not supported by sufficient evidence. Mother's and maternal grandfather's assignments of error are sustained.

9

{¶24}   The trial court's grant of permanent custody is reversed, and this case is remanded for further proceedings.

Judgment reversed and cause remanded.

ZAYAS, P.J., and BERGERON, J., concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.