[Cite as *In re A.H.*, 2025-Ohio-2708.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


IN RE: A.H.                                :          APPEAL NOS.  C-250178
                                                                  C-250209
                                           :          TRIAL NO.    F/19/1328 Z

                                           :

                                           :          *JUDGMENT ENTRY*



This cause was heard upon the appeals, the record, and the briefs.

The judgment of the trial court is reversed and the cause is remanded for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for these appeals, allows no penalty, and orders that costs are taxed under App.R. 24.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 8/1/2025 per order of the court.**


**By:**_____
          **Administrative Judge**

[Cite as *In re A.H.*, 2025-Ohio-2708.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE: A.H. | : | APPEAL NOS. | C-250178 |
| | | | C-250209 |
| | : | TRIAL NO. | F/19/1328 Z |
| | : | | |
| | : | *O P I N I O N* | |

Appeals From: Hamilton County Juvenile Court

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: August 1, 2025

*Jeffrey J. Cutcher*, for Appellant Father,

*Constance Potter*, for Appellant Great Aunt,

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Patsy Bradbury,* Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Allison Smith*, Assistant Public Defender, for Appellee Guardian ad Litem.

**Bock, Judge.**

**{¶1}** In these consolidated appeals, appellant Father and appellant maternal great aunt ("Aunt") challenge the juvenile court's judgment granting permanent custody of Father's child A.H. to appellee Hamilton County Department of Job and Family Services ("HCJFS") and denying Aunt's petition for legal custody of A.H.

**{¶2}** We sustain both assignments of error and reverse the juvenile court's judgment. The juvenile court's determination that a legally secure placement could not be obtained without granting permanent custody to HCJFS was not supported by clear and convincing evidence. Aunt was a former foster parent who had adopted her developmentally-disabled nephew and had an approved Interstate Compact for the Placement of Children ("ICPC") home study. And the juvenile court's finding that Aunt minimized Mother's substance abuse was based on speculative testimony.

### I. Facts and Procedure

#### A. Procedure[1]

**{¶3}** In September 2021, HCJFS filed a complaint for temporary custody of A.H. and three of her siblings.[2] The complaint alleged that A.H. tested positive at birth for marijuana, amphetamines, methamphetamines, and Clonazepam. In August and October 2021, A.H.'s grandmother petitioned for custody. The juvenile court granted HCJFS temporary custody of the children. HCJFS filed a case plan for reunification in May 2022.

**{¶4}** In August 2022, the juvenile court adjudicated A.H. abused, neglected, and dependent. Later that month, HCJFS moved to extend temporary custody of A.H.,

---

[1] Neither Mother nor Grandmother appealed the juvenile court's judgment, so we limit our discussion about them to only those issues relevant to Father's and Aunt's appeals.
[2] A.H.'s siblings are not subject to this appeal.

noting that there had been progress towards reunification.

**{¶5}** In January 2023, HCJFS moved for permanent custody of A.H. Just short of two months later, Aunt petitioned for custody of A.H.

## B. Facts

**{¶6}** Neither Father nor Mother claimed to be able to care for A.H., but both urged the juvenile court to award legal custody to Grandmother or Aunt. HCJFS asked the court to award it permanent custody of A.H. The Guardian ad Litem ("GAL") advocated for HCJFS to have permanent custody.

### 1. A.H.'s family and history

**{¶7}** HCJFS caseworker Destinee Dunn handled A.H.'s case beginning in October 2023. She testified that A.H. was born in July 2021 and had been in HCJFS's temporary custody since September 2021. A.H. had been living with the same foster family during that time. A.H.'s foster family was interested in adopting her.

**{¶8}** Father was incarcerated with a 2040 expected release date, so he did not participate in case-plan services. Dunn testified that Mother had ongoing, untreated substance-abuse issues. Although Mother did not complete many case-plan services, she did attend every drug screening to which HCJFS referred her, which occurred monthly or more frequently. The results for all the drug screens were positive for nonprescribed controlled substances.

### 2. HCJFS error delayed Aunt's home study and visitation

**{¶9}** After Aunt filed her custody petition, the juvenile court ordered HCJFS to initiate an ICPC home study for Aunt, who lived in Tennessee. But despite the juvenile court ordering HCJFS to initiate the ICPC home study in April 2023 and reminding HCJFS several times, months later, HCJFS still had not initiated the ICPC home study. Indeed, HCJFS did not initiate the ICPC home study until after Dunn

4

began handling A.H.'s case in October 2023.

**{¶10}** Dunn testified that HCJFS failed to initiate the ICPC study when the juvenile court ordered it to do so because "the ICPC was not submitted to the proper e-mail. It was like completed but not submitted to the right place." The ICPC home study was completed in March 2024 and it approved Aunt for A.H.'s placement.

**{¶11}** Dunn visited Aunt's home in April 2024 and explained, "It was clean. She had a room set up for [A.H.]. She had toys for her. There were no concerns for the house." Aunt began bi-weekly visits with A.H. after Dunn visited her home. At the time of trial, Aunt had visited A.H. six times.

**{¶12}** Dunn testified that Aunt told her that no one from HCJFS had reached out to her about visiting A.H. But when Dunn "looked at [] notes, she was reached out to at the beginning of the case. She had contact information. She just never followed up on it to get the visits. The visits didn't get started until I asked her and set them up in April."

**{¶13}** Dunn, however, later conceded that HCJFS does not offer visitation to a child's nonparent relatives. HCJFS makes an exception to that process—when a nonparent relative is a potential placement for a child, it allows nonparent visits. But, Dunn conceded, until HCJFS initiated the ICPC home study and Aunt was approved for placement, HCJFS did not consider Aunt a potential placement option for A.H.

### 3. Visits between A.H. and Aunt/Mother

**{¶14}** Anita Flagg, a family resource specialist at JusticeWorks, assists and facilitates visits between parents and children at its facility. Flagg explained that Aunt had begun visiting A.H. in the spring of 2024 and the visits had gone well. While A.H. did not know Aunt "and initially she just shied away from her," A.H. quickly warmed up to Aunt and by "the third visit, she's giving hugs and telling her she loves her and

5

kissing her, and . . . the visits went extremely well with her."

**{¶15}** Aunt testified that her visits with A.H. had been going well and A.H. had "gotten very acclimated towards me. She's very loving towards me. She gives hugs, big hugs and little hugs, big kisses and little kisses. We've come a long way."

**{¶16}** Aunt explained that on days she visits A.H., she leaves Tennessee at 2:00 or 3:00 a.m., drives five hours to Cincinnati, has a two-hour visit with A.H., and then drives five hours back home. Flagg and the GAL testified that Aunt brought A.H. toys and snacks.

**{¶17}** Flagg testified that when A.H. arrives for visits, she "separate[s] easily from the [foster parent]" and there are times "when she doesn't want to end a visit."

*4. HCJFS and the GAL believed Aunt minimized Mother's substance abuse*

**{¶18}** Dunn testified that HCJFS had "concerns" about Aunt "minimizing or not being able to recognize if [Mother] is high. We wouldn't want her to send [A.H.] with [Mother] if she's under the influence." Dunn testified that when she asked about Mother's substance abuse, Aunt replied, "I've talked to her and she's saying she's clean. I told her if she really is, she needs to get into treatment to prove me wrong." From that, Dunn concluded, "it's really not clear communication or understanding." Further, Dunn said that Aunt "doesn't press the importance of getting clean."

**{¶19}** During cross-examination, Dunn further explained the basis for HCJFS's concerns about Aunt minimizing or not understanding Mother's substance abuse and its belief that Aunt would not recognize if Mother were impaired:

Aunt's Counsel: Now, you stated that you did not believe [Aunt] could recognize any person being intoxicated or high or impaired?

Dunn: Yes.

Aunt's Counsel: And what brought you to that conclusion?

Dunn: Because she didn't fully believe that [Mother] was using. She was like I don't understand how she's been using, if she is using, she should get into treatment to prove she's not using. I confirmed that she has been using the whole duration of the case. [Aunt] questioned the validity of the drug screens, if we know how to read the drug screens.

Aunt's Counsel: But that doesn't mean she wouldn't recognize it if she saw someone high.

Dunn: Well, [Mother] seems to have continuous substance use. If she's been using for three years now, I'm sure [Aunt] has seen [Mother] at some point and to still not be able to recognize that --

Aunt's Counsel: You're speculating. You're sure that she must have seen her?

Dunn: In three years, I would say so if she's family, but --

Aunt's Counsel: She lives five hours away, doesn't she, and you don't know [how often she made the trip before her visits with A.H.], do you?

Dunn: No.

Aunt's Counsel: And you didn't ask [Aunt] how often she saw her family [in Cincinnati]. You didn't ask her if she came at holidays or took a vacation with them, so you don't have any reason to believe she ever saw Mother high, in fact, if she came to [Grandmother's] home. You don't even know if she saw [Mother], correct?

. . .

Dunn: I don't know if [Mother] was there or not.

Aunt's Counsel: . . . [D]o you know what [Aunt]'s background is in drug use and drug rehab?

Dunn: No, I don't. I just know the whole family has significant JFS history or substance use, so she is involved with a family that has substance use issues.

**{¶20}** Likewise, the GAL testified that she "did believe that there was some minimizing of Mom's drug use" by Aunt. She testified that Mother had told Aunt that she was clean and Aunt believed her. But she also testified that Aunt had the capacity to protect A.H. if Mother were "on drugs or if there's any safety concerns."

**{¶21}** Dunn admitted that she did not remember any time in which she met with Mother and suspected that Mother was impaired. Likewise, Flagg—who facilitated Mother's weekly visitations with A.H. for more than a year and underwent annual training to recognize when parents visiting their children at JusticeWorks are using drugs—never suspected that Mother was impaired during a visit. Finally, the GAL had met with Mother multiple times and, though Mother was nervous, the GAL never reported or noted that Mother was impaired during a meeting.

**{¶22}** Other than Aunt's alleged minimization of Mother's substance abuse and the relatively few visits between A.H. and Aunt, HCJFS and the GAL shared no concerns about Aunt.

*5. A.H.'s foster family*

**{¶23}** A.H.'s foster mother testified that A.H. had lived with her family since September 2021. Her two children live in the home and consider A.H. a sibling. A.H.'s foster family wished to adopt A.H. if the juvenile court granted HCJFS permanent custody of A.H. The foster mother refers to herself to A.H. as "mom"; likewise, A.H. calls the foster mother "mom."

**{¶24}** The GAL believed A.H. "being removed from her foster home would cause a significant loss for her" because A.H. "view[s] the foster parents as her

parents." She based that opinion primarily on A.H. having lived with this foster family for nearly three years, since she was eight weeks old. The GAL did not believe that Aunt had visited with A.H. for enough time to have formed a bond with her.

6. *Aunt's history and custody efforts*

{¶25} Aunt lived in Tennessee. She had two children and four grandchildren. At one point, Aunt had custody of three of A.H.'s cousins. She adopted her nephew, who had cerebral palsy and other special needs. She raised this child, who was 16 years old at the time of trial, starting when he was a few months old.

{¶26} Aunt explained that when she learned that A.H. had been removed from her family, she called 241-KIDS to ask about placement and was told that "they had to do a background check, she would get back with me . . . that never happened." Aunt stated that she "tried calling back. Nobody seemed to know anything."

{¶27} Aunt testified that the ICPC process "kept getting postponed and postponed and nobody knew where it was at because I kept calling my county asking about it." Once the ICPC home study was approved, Dunn visited Aunt's house and "she asked me if I wanted visits, and I said, yes, of course. I didn't even know that was an option." During that visit, Aunt "made it clear . . . that [she] would abide by whatever they set forth."

{¶28} Aunt testified that she had worked as a dispatcher and a fleet manager for a trucking company and was "qualified to spot drug usage in the line of work that I have done my whole life. I have had to go through extensive training to know when somebody's on drugs, and I've done [the training] repeatedly." Aunt had been a foster parent in Tennessee; she had fostered "about 40 kids on and off over three years."

{¶29} Aunt testified about HCJFS's and the GAL's beliefs that she minimized Mother's drug use:

I don't think they know my background. I mean, you know, if I thought [Mother] was on drugs and I thought [A.H.] was in trouble, don't think for one minute I wouldn't address it. I would call the police if necessary. That's me. I don't play games. I make it perfectly clear to everyone I'm here to protect that child, and, you know, if I felt that there's imminent danger, I'm going to make sure it doesn't happen. I would do it with anybody's child, not just mine.

**{¶30}** Aunt testified that she had not seen Mother in an impaired state and had never seen Mother's drug-screen results. The magistrate confirmed that Aunt would not have been permitted access to those screen results. Aunt testified that between the pandemic and October 2023, she had seen Mother, "[m]aybe three times."

**{¶31}** Aunt believed that A.H. should be placed with her: "Well, she'd be with family. She would know her siblings. She would know her mother. She would know she has a family that loves her and cares about her. I think that's crucial in today's society. You need to know your family." Aunt reiterated that she is "committed to [A.H.]. I care about this child."

7.   *The juvenile court awarded HCJFS permanent custody*

**{¶32}** The magistrate issued her decision granting HCJFS permanent custody of A.H. and denying Aunt's legal-custody petition. The magistrate specifically determined that the witnesses, including Aunt, were credible. And the decision noted that extending temporary custody was impossible due to the age of the case.

**{¶33}** Regarding A.H.'s best interest, the magistrate determined that while A.H. was bonded with Aunt, "[i]n the big picture, the amount of time . . . Aunt spend[s] with [A.H.] is minimal. [A.H.] enjoys the visits but her life and home is with the foster

family."

**{¶34}** Moreover, the magistrate determined that a legally-secure placement could not be achieved without granting HCJFS permanent custody. She noted that while Aunt knew that A.H. had been removed from her parents' custody in September 2021, she did not file her custody petition until March 2023, after A.H. had been in HCJFS's custody for a year and a half.

**{¶35}** The magistrate discussed the ICPC process, stating that "typically" after an out-of-state placement is approved, "the receiving state monitors the placement for six months while the child is still in the custody of the sending state before the receiving state approves the placement for custody." She explained that Tennessee requires those approved for an ICPC placement to become "fully approved foster parents" within 120 days of placement. Therefore, the magistrate explained, A.H. would have to be placed with Aunt while still in HCJFS's custody while Aunt became a licensed foster parent "and for any other amount of time required by Tennessee before it approved the placement for custody." But because A.H. had already been in HCJFS's temporary custody for nearly three years, "an extension of temporary custody is not statutorily possible." (The magistrate's source for information about what is "typical" for ICPC placements and Tennessee's specific ICPC requirements is unknown. No one testified about these requirements and the ICPC home-study report does not indicate that these requirements exist.)

**{¶36}** The magistrate determined that Aunt had "expressed to HCJFS that she does not believe Mother is abusing substances. This speaks to [Aunt's] ability to protect [A.H.]." Finally, the magistrate found that because A.H. had been in the same foster home her entire life, removing her from "the only home she has known would absolutely be traumatic for her."

{¶37} Father, Aunt, and Grandmother objected to the magistrate's decision. Citing (among other factors) A.H.'s three-year placement with her foster family, Aunt's lack of a relationship with A.H. before March 2024, and "concerns regarding [Aunt's] understanding of Mother's substance abuse concerns" because Aunt had never seen Mother impaired and did not "see it in her actions despite A.H. being born positive" for drugs, the juvenile court overruled the objections. It accepted the magistrate's decision and adopted it "as the Order of the Court" and granted HCJFS permanent custody of A.H.

{¶38} Father and Aunt have appealed the juvenile court's judgment.

## II. Analysis

{¶39} On appeal, Father asserts that the juvenile court erred in determining that it was in A.H.'s best interest to grant permanent custody of A.H. to HCJFS. And Aunt argues that the court erred in denying her petition for legal custody.

### A. Standards of review

#### 1. Permanent custody

{¶40} Appellate courts review a juvenile court's decision on permanent custody under sufficiency-of-the-evidence and manifest-weight-of-the-evidence standards. *In re Z.C.*, 2023-Ohio-4703, ¶ 11.

{¶41} A sufficiency-of-the-evidence review is "a test of adequacy" under which appellate courts ask whether there is legally sufficient evidence on each element necessary to support the judgment. *Id.* at ¶ 13, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶42} Under a manifest-weight-of-the-evidence challenge, a party argues that the State failed to meet its burden of persuasion at trial. *State v. Hurt*, 2024-Ohio-3115, ¶ 95 (1st Dist.). An appellate court "must 'independently "review the entire

record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice."'" *Id.*, quoting *State v. Kizilkaya*, 2023-Ohio-3989, ¶ 15 (1st Dist.), quoting *State v. Powell*, 2020-Ohio-4283, ¶ 16 (1st Dist.).

*2.    Legal custody*

**{¶43}** Unlike permanent-custody decisions, we review the juvenile court's denial of Aunt's legal-custody petition for an abuse of discretion. *In re E.H.*, 2022-Ohio-4701, ¶ 13 (1st Dist.). We evaluate challenges to legal-custody determinations differently because awarding a nonparent legal custody "does not divest parents of their residual parental rights, privileges, and responsibilities.'" *In re M/E*, 2021-Ohio-450, ¶ 18 (1st Dist.), quoting *In re A.W.*, 2015-Ohio-489, ¶ 9 (1st Dist.). In the legal-custody context, a juvenile court abuses its discretion if its custody determination is not supported by competent and credible evidence. *In re E.H.* at ¶ 13 ; *In re M.S.*, 2025-Ohio-1194, ¶ 17 (1st Dist.); *see In re Wilkenson,* 2001 Ohio App. LEXIS 4589, at *5-6 (1st Dist. Oct. 12, 2001) ("An abuse of discretion is more than an error of law or judgment; it is a decision that is unreasonable, arbitrary, or unconscionable. If the court's decision regarding a child's best interest is not supported by competent, credible evidence, then it is unreasonable and may be reversed.")

*3.    Statutes governing parental termination and legal custody*

**{¶44}** R.C. 2151.414 governs the termination of parental rights. That statute permits a juvenile court to grant a child-services agency permanent custody of a child if it determines, by clear and convincing evidence, that (1) any one of the five enumerated factors under R.C. 2151.414(B)(1)(a)-(e) applies, and (2) awarding the agency permanent custody is in the child's best interest. *In re Z.C.*, 2023-Ohio-4703, at ¶ 7; *see* R.C. 2151.414(B). Clear and convincing evidence is the degree of proof that

"will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Z.C.* at ¶ 7.

**{¶45}** After a juvenile court adjudicates a child abused, neglected, or dependent, it may grant legal custody of the child to any other person requesting legal custody. R.C. 2151.353(A)(3). In considering a legal-custody petition, the juvenile court considers whether granting legal custody to the petitioner is in the child's best interest using the relevant factors in R.C. 2151.414(D)(1) and R.C. 3109.04(F) as guidance. *In re B.R.F.*, 2025-Ohio-2061, ¶ 17 (1st Dist.); *In re E.B.*, 2019-Ohio-3943, ¶ 14 (1st Dist.). Because R.C. 2151.353(A)(3) does not enumerate specific best-interest factors, the juvenile court has "more flexibility in the best interest analysis in legal custody cases as compared to permanent custody." *In re E.B.* at ¶ 14. And unlike a decision granting a child-services agency permanent custody, which must be supported by clear and convincing evidence, a juvenile court's legal-custody decision must be supported by a preponderance of the evidence. *In re A.W.*, 2015-Ohio-489, ¶ 9 (1st Dist.).

**{¶46}** Father does not challenge the juvenile court's finding that R.C. 2151.414(B)(1)(d) applied. Thus, on appeal, Father challenges only the juvenile court's R.C. 2151.414(D)(1) conclusion that it was in A.H.'s best interest to award HCJFS permanent custody. Accordingly, both Father's and Aunt's challenges to the juvenile court's order come down to whether the juvenile court properly determined A.H.'s best interest, although their challenges involve different burdens of proof.

*4.     R.C. 3109.04(F)(1) best-interest factor*

**{¶47}** Courts may consider R.C. 3109.04(F)(1)'s best-interest factors when determining a child's best interest in a legal-custody decision. The only factor relevant to Aunt's custody petition that is not duplicative of the R.C. 2151.414(D)(1) factors is

14

R.C. 3109.04(F)(1)(a), "[t]he wishes of the child's parents regarding the child's care."

**{¶48}** Below, both Father and Mother asked the court to grant legal custody to a nonparent relative. And on appeal, Father advocates for the child to be placed in Aunt's legal custody.

### 5. *R.C. 2151.414(D)(1) best-interest factors*

**{¶49}** When determining whether granting HCJFS permanent custody is in a child's best interest, the juvenile court must consider "all relevant factors," including, but not limited to, the R.C. 2151.414(D)(1)(a)-(e) factors. Courts consider a child's best interest to be "a fluid concept," and should consider the child's changing needs. *In re K.D.*, 2024-Ohio-5582, ¶ 50 (1st Dist.), citing *In re D.V.*, 2022-Ohio-1024, ¶ 12 (1st Dist.).

**{¶50}** Neither Father nor Aunt challenges the juvenile court's best-interest findings under R.C. 2151.414(D)(1)(b), (c), or (e): A.H.'s being too young to express her wishes regarding placement, A.H.'s custodial history (including the inability to further extend temporary custody), and Father's abandoning A.H.

### 6. *R.C. 2151.414(D)(1)(a): The child's interactions and interrelationships*

**{¶51}** R.C. 2151.414(D)(1)(a) requires juvenile courts to consider a child's "interaction[s] and interrelationship[s] . . . with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child."

**{¶52}** The evidence showed that A.H. had a strong bond with her foster family. And it also showed that A.H. had a bond with Mother, Grandmother, and Aunt. The magistrate, however, minimized A.H.'s bond with them: "In the big picture, the amount of time [they] spend with [A.H.] is minimal. [A.H.] enjoys the visits but her life and home is with the foster family."

15

{¶53} Father does not directly challenge the juvenile court's finding that A.H. developed a bond with her foster family during the three years she lived with them. But he points out that this three-year period "would have been shortened significantly had HCJFS not been responsible for a six-month delay in initiating the ICPC."

{¶54} HCJFS made an error in initiating the ICPC process when the court ordered it to do so. Then, it apparently failed to follow up for about six months, causing the ICPC home study for Aunt to be significantly delayed. And Dunn testified that HCJFS does not permit a nonparent relative to visit a child unless the relative has been approved as a placement option. Accordingly, but for HCJFS's delaying the ICPC home study, it is likely that Aunt would have been afforded many more opportunities to visit A.H. and build a stronger bond with her.

{¶55} While there is no question that HCJFS's noncompliance with the juvenile court's order to initiate the ICPC home study reduced Aunt's time with A.H., the juvenile court had to consider only A.H.'s bond with her caregivers as it stood at the time of trial. Ultimately, this factor weighs in favor of permanent custody. A.H. had formed stronger bonds with her foster family than with any other person.

{¶56} But although Aunt had visited only six times at the time of trial, the visits indisputably went well and A.H. had begun developing a bond with Aunt. The juvenile court's minimization of their bond was not supported by the record.

{¶57} The juvenile court also faulted Aunt for not seeking custody of A.H. until around 18 months into the proceedings. But HCJFS's original stated goal for the family was reunification. That only changed when HCJFS sought permanent custody on January 31, 2023.

{¶58} Aunt petitioned for custody of A.H. on March 27, 2023, fewer than two months after HCJFS filed its permanent-custody motion. As Aunt argued at the

objection hearing, at the beginning of the case, HCJFS's goal was reunification. Faulting Aunt for waiting to petition for custody until after HCJFS made it clear that A.H. would not be reunified with her parents fails to recognize that a family member could wish to avoid interfering with a reunification plan. Instead, a family member may seek custody after HCJFS moves for permanent custody, signaling that it no longer believes the child can be reunited with her parents.

7.     *R.C. 2151.414(D)(1)(d): Legally secure permanent placement*

**{¶59}** Father and Aunt challenge the juvenile court's finding that A.H. could not obtain a legally secure permanent placement without granting HCJFS permanent custody. Both assert that Aunt could have provided a secure permanent placement without terminating parental rights.

a) Statute and relevant case law

**{¶60}** R.C. 2151.414(D)(1)(d) requires juvenile courts to consider a "child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." This court has stated that "a legally secure permanent placement 'is more than a house with four walls.'" *In re P. & H.*, 2019-Ohio-3637, ¶ 42 (1st Dist.), quoting *In re K.W.*, 2018-Ohio-1933, ¶ 87 (4th Dist.). Instead, a legally secure placement is a stable, safe environment where a child lives with dependable adults who provide for the child's needs. *Id.*

**{¶61}** Father and Aunt argue that this case warrants reversal for the same reasons found in *In re B.J.*, 2021-Ohio-373 (1st Dist.). There, this court reversed the juvenile court's termination of the mother's parental rights and denial of the grandfather's petition for legal custody. *Id.* at ¶ 24. There was no dispute that the child could not be placed with either parent. *Id.* at ¶ 22. The child had been in the same foster home since birth and had developed a bond with the foster parents, who were

foster-to-adopt foster parents. *Id.* at ¶ 8. A relative—the child's grandfather—lived in Nebraska and had "expressed an interest in caring for B.J. since her birth." *Id.* at ¶ 22. The grandfather filed his legal-custody petition after HCJFS moved for permanent custody. *Id.* at ¶ 6. The grandfather fully participated in the ICPC process, which approved grandfather for placement. *Id.* at ¶ 22. By the time of the permanent-custody trial, the grandfather had visited the child only twice. *Id.* at ¶ 22.

{¶62} We rejected the juvenile court's determination that the grandfather would be unable to protect B.J. from the mother as "speculation" because "B.J. has yet to be placed in maternal grandfather's care, and he accordingly has never been in the position to protect B.J. from mother or failed to do so." *Id.* at ¶ 21. The ICPC report showed that grandfather cared for "their teenage son who is in high school and has plans to study business in college, and who is involved in the family's church. Maternal grandfather has a steady income and a safe home where B.J. will have her own bedroom. He also has a strong family support system." *Id.* at ¶ 22. The ICPC report described the grandparents as "caring, kind, and compassionate people" with "a safe, stable home and a steady source of income" and "a good understanding of their daughter's mental health needs and are able to establish strong boundaries with her, in order to maintain [B.J.'s] safety and well-being." *Id.* at ¶ 22. Accordingly, we reversed the juvenile court's judgment because the record showed that a legally secure placement could be secured by placing B.J. with her grandparent. *Id.* at ¶ 23-24.

b) <u>Aunt could provide a secure permanent placement</u>

{¶63} It is unclear whether the juvenile court determined that it could not achieve a secure permanent placement for A.H. without the court awarding permanent custody to HCJFS. The juvenile court "approved and adopted" the magistrate's decision as both "the Order" and "the Judgement[sic] of the Court." And the

magistrate's decision determined, "the court does not find that [A.H.]'s need for a legally secure permanent placement can be achieved without a grant of permanent custody [to HCJFS]." Yet, the juvenile court also stated, "[Aunt] may represent a legally secure placement."

**{¶64}** We hold that the juvenile court could have achieved a legally secure permanent placement for A.H. without terminating her parents' rights and awarding HCJFS permanent custody.

**{¶65}** Aunt raised her two children and adopted her now-16-year-old great-nephew, who has cerebral palsy and other special needs, when he was a few months old. Aunt was a foster parent to around 40 children in a three-year period. After HCJFS initiated the ICPC process, the ICPC study approved Aunt for placement. The home study revealed that Aunt was financially capable of providing for A.H. and had "supports in place with her family," as her daughters and four grandchildren live near Aunt. Dunn visited Aunt's home and testified that she did not have any concerns about Aunt's home—she had a bedroom available for A.H. in her safe home, located in a safe area, close to schools and hospitals. By the time of the trial, Aunt had visited A.H. six times. This entailed her driving ten hours roundtrip for the two-hour biweekly visits, demonstrating her commitment to A.H. The visitation supervisor testified that these visits had gone "extremely well." This evidence illustrated that the juvenile court could have achieved a legally secure permanent placement for A.H. without granting HCJFS permanent custody.

**{¶66}** The juvenile court, both in its own written decision and through adopting the magistrate's decision, generally relied on two overarching reasons to award HCJFS permanent custody, rather than awarding Aunt custody: (1) Aunt minimizing Mother's substance abuse, and (2) A.H.'s long tenure and bond with her

foster family.

   *i.   Mother's substance abuse*

**{¶67}** The evidence involving Aunt's minimizing Mother's substance abuse was not clear, convincing, competent, or credible.

**{¶68}** First, according to Dunn, Mother had told Aunt she was drug free and Aunt answered that if she was clean, "she needs to get into treatment to prove me wrong." Likewise, Dunn later testified that Aunt said about Mother, "I don't understand how [Mother's] been using, if she is using, she should get into treatment to prove she's not using." This evidence does not indicate minimization of Mother's substance abuse. Indeed, it shows the opposite. Dunn's recollection reflects Aunt's awareness that Mother needed treatment. Aunt's response to Mother denying substance abuse was to challenge Mother to get substance-abuse treatment. Her repeated references to treatment underscore, rather than understate, the serious nature of Mother's drug use.

**{¶69}** Second, the GAL described a similar conversation: Aunt was "being told by [Mother] that she is not using and she believes her, yet there are drug screens that speak otherwise." But, as the magistrate confirmed, Aunt did not have access to Mother's drug-screen results and would not have been permitted to see those results even if she had requested them.

**{¶70}** Third, the juvenile court relied on Aunt's remarks that she had never seen Mother impaired. But two professionals who had more frequent interactions than Aunt had with Mother—Dunn and the GAL—did not remember ever seeing or suspecting that Mother was impaired during their interactions with Mother, despite being aware that Mother had tested positive for unprescribed drugs. And Flagg, the visitation facilitator who supervised Mothers and A.H.'s visits every week for more

than a year, was qualified to recognize an impaired person. She attended yearly trainings to ensure children's safety, including how to recognize signs that a parent is under the influence of drugs or alcohol. Despite this and the number of times she had seen Mother during the previous year, Flagg testified that she never suspected that Mother was under the influence of any substances during the visits.

**{¶71}** No one who interacted with Mother testified that they had witnessed or suspected that she was impaired. And unlike Dunn, the GAL, and Flagg, Aunt lived five hours away from Mother and, before joining Mother's visits with A.H., had only seen her three times in the previous four years.

**{¶72}** Relatedly, Aunt testified that she had been trained for her job on how to recognize and deal with substance abuse. And Aunt testified that if she "thought [Mother] was on drugs and I thought [A.H.] was in trouble, don't think for one minute I wouldn't address it. I would call the police if necessary. That's me. I don't play games." Aunt's testimony, which the magistrate found credible, establishes that she would not hesitate to protect A.H. from anyone, including Mother. And Aunt's living five hours away from Mother further cuts against any speculative concern that Aunt would turn A.H. over to Mother when Mother was impaired.

**{¶73}** The evidence did not support the juvenile court's "concerns" about Aunt minimizing and not understanding Mother's substance abuse.

*ii.   A.H.'s bonds*

**{¶74}** As discussed above, the juvenile court pointed out that Aunt had not petitioned for custody when A.H. was first placed in HCJFS's custody. It noted that until a few months before trial, A.H. and Aunt had never met and had no relationship, while A.H. had lived with her foster family for nearly three years. The juvenile court found that while Aunt "may represent a legally secure placement," it was not in A.H.'s

best interest "to be uprooted from the only home she has known and had built significant bonds with."

**{¶75}** The juvenile court cited *In re B.J.*, 2021-Ohio-373 (1st Dist.), and recounted its facts. It did not expressly distinguish that case from the instant case. We hold that *In re B.J.* is not distinguishable from this case in any relevant manner.

**{¶76}** In both cases, HCJFS and the GAL advocated for HCJFS being awarded permanent custody of the child. The *In re B.J.* court held that the grandfather could provide a legally secure placement where he had an approved ICPC home study, which confirmed that he could provide a safe home, had begun successful visits with the child, and any "concerns" about his ability to protect the child were based solely on speculation. Here, Aunt had an approved ICPC placement, which revealed that she has a safe and clean home ready for A.H. Like the grandfather in *In re B.J.*, Aunt has demonstrated her ability to safely care for children—she had raised her own children, adopted her great-nephew who has special needs, and served as a foster parent to around 40 children. Finally, Aunt's testimony unequivocally established that she had strong protective instincts and would place A.H.'s wellbeing at the forefront.

**{¶77}** The juvenile court noted that in *In re B.J.*, the initial case plan indicated that the grandfather had been in contact with HCJFS, but Aunt called HCJFS "four times over a six month period when A.H. was first placed in interim custody," and "took no further action" until HCJFS filed for permanent custody, a year and a half after A.H. had been in its temporary custody. HCJFS points to these facts to argue that *In re B.J.* is distinguishable. But, like the grandfather in *In re B.J.*, Aunt was "in contact" with HCJFS beginning shortly after A.H.'s initial placement into HCJFS's custody. Aunt called infrequently for "a six month period." Her failure to continually call HCJFS does not say anything about her ability to provide A.H. a secure home.

Moreover, though HCJFS and the GAL fault Aunt for only visiting A.H. six times before trial, HCJFS was responsible for delaying visitation.

**{¶78}** One difference between this case and *In re B.J.* cuts in Aunt's favor. The grandfather in *In re B.J.* had visited his granddaughter only twice. Aunt, on the other hand, had visited A.H. six times. Moreover, in *In re B.J.*, the opinion recognized only the bond between B.J. and her foster family and did not make any mention of a bond between grandfather and child. But here, the juvenile court found that Aunt and A.H. were bonded.

**{¶79}** The record shows that the juvenile court could have achieved a legally secure placement for A.H. with Aunt.

**{¶80}** This case mirrors the facts in *In re B.J.* Like in that case, this court finds that granting HCJFS permanent custody was not in the child's best interest. Here, like in *In re B.J.*, the evidence demonstrated that Aunt can provide a legally secure permanent placement. And unlike the child in *In re B.J.*, who had developed no meaningful bond with any family members, A.H. has developed a bond with Aunt. *See In re B.J.*, 2021-Ohio-373, at ¶ 7 (1st Dist.) (explaining that the child's mother was listed as an "absent parent" and had moved to Nebraska, and that the child's father had never engaged in visitation).

**{¶81}** We are mindful that R.C. 2151.414 "does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor." *In re Schaefer*, 2006-Ohio-5513, ¶ 64. But our review of the law and the evidence in this case compels us to hold that the juvenile court's judgment was not supported by sufficient clear and convincing evidence or by a preponderance of competent, credible evidence.

**{¶82}** We sustain Father's and Aunt's assignments of error.

### III. Conclusion

**{¶83}** For the foregoing reasons, we sustain Father's and Aunt's assignments of error, reverse the juvenile court's judgment granting HCJFS's motion for permanent custody, and remand for further proceedings consistent with this opinion.

Judgment reversed and cause remanded.

**KINSLEY, P.J.,** and **MOORE, J.,** concur